**BENIHANA OF TOKYO, INC.,**
individually and on behalf of
Benihana, Inc., Plaintiff,

v.

**BENIHANA, INC., John E. Abdo, Norman Becker, Darwin Dornbush, Max Pine, Yoshihiro Sano, Joel Schwartz, Robert B. Sturges, Takanori Yoshimoto, and BFC Financial Corporation, Defendants.**

Civil Action No. 550–N.

Court of Chancery of Delaware,
New Castle County.

Submitted: Aug. 3, 2005.
Decided: Dec. 8, 2005.

154

C. Barr Flinn, Esquire, Richard H. Morse, Esquire, Danielle Gibbs, Esquire, Kevin M. Baird, Esquire, Glenn C. Mandalas, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, Attorneys for Plaintiff Benihana of Tokyo, Inc.

Gregory V. Varallo, Esquire, Lisa M. Zwally, Esquire, Richards Layton & Finger, P.A., Wilmington, Delaware; C. Thomas Tew, Esquire, Dennis Nowak, Esquire, Jeffrey Tew, Esquire, Tew Cardenas, LLP, Miami, Florida, Attorneys for Defendants Benihana, Inc., Norman Becker, Darwin Dornbush, Max Pine, Yoshihiro Sano, Joel Schwartz, Robert B. Sturges and Takanori Yoshimoto.

John G. Harris, Esquire, Reed Smith LLP, Wilmington, Delaware; Alan K. Cotler, Esquire, Reed Smith LLP, Philadelphia, Pennsylvania; Alan H. Fein, Esquire, Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., Miami, Florida, Attorneys for Defendants BFC Financial Corporation and John E. Abdo.

## OPINION

PARSONS, Vice Chancellor.

Plaintiff, Benihana of Tokyo, Inc. ("BOT"), seeks rescission of an agreement between Defendants Benihana Inc. ("Benihana" or the "Company") and BFC Financial Corporation ("BFC") to issue $20 million of Benihana preferred stock to BFC

(the "BFC Transaction" or "Transaction"). BOT's complaint asserts that: (1) the BFC Transaction violated 8 *Del. C.* § 151 and Benihana's Certificate of Incorporation by granting BFC shares with preemptive rights and is therefore void as *ultra vires;* (2) eight of Benihana's nine directors, namely, John E. Abdo, Norman Becker, Darwin Dornbush, Max Pine, Yoshihiro Sano, Joel Schwartz, Robert B. Sturges and Takanori Yoshimoto (collectively, "Director Defendants") breached their fiduciary duties of loyalty and care in approving the BFC Transaction; (3) the BFC Transaction had an improper primary purpose to dilute BOT's interest in Benihana and entrench certain Director Defendants; (4) the BFC Transaction should receive entire fairness review and fails such review; and (5) BFC aided and abetted the Director Defendants in their actions. Additionally, BOT seeks damages for costs it incurred in a proxy contest that allegedly would have been unnecessary if the BFC Transaction had not occurred. If the Court does not rescind the BFC Transaction, BOT seeks compensatory damages.

BOT filed its Complaint on July 2, 2004, along with motions for expedited proceedings and a preliminary injunction. The Court granted in part the request for expedited proceedings. Trial was held from November 9 through 15, 2004.[1] This Opinion reflects the Court's post-trial findings of fact and conclusions of law.

1. After post-trial briefing and argument, the parties became engaged in settlement negotiations and requested that the Court defer rendering an opinion pending the outcome of those negotiations. In August 2005, the parties withdrew that request after their efforts to settle failed.

2. The following summary includes the facts pertinent to the issues presented at trial. For additional background facts see *Benihana of Tokyo, Inc. v. Benihana, Inc.,* 2005 WL 583828 (Del.Ch. Feb. 28, 2005).

For the reasons stated below the Court finds as follows: (1) the Board had authority under Benihana's Certificate of Incorporation and the applicable provisions of the DGCL to issue the preferred stock with preemptive rights that is the subject of the BFC Transaction; (2) a majority of the informed, disinterested and independent directors approved the transaction; (3) the directors did not have an improper purpose of entrenchment; (4) the directors did not breach their fiduciary duties of loyalty and care; and (5) the BFC Transaction was a valid exercise of the Board members business judgment. Accordingly, the Court will deny BOT's claims for relief and enter judgment in favor of Defendants.

## I. FACTS[2]

### A. The Parties

■ Rocky Aoki founded BOT in 1963 as a New York corporation. BOT owns and operates Benihana restaurants outside the continental United States and owns intellectual property interests in the Benihana name and trademarks. Rocky Aoki also founded nominal Defendant Benihana. Benihana was incorporated on December 6, 1994 as a Delaware corporation with its principal place of business in Florida; it operates and franchises Benihana restaurants within the continental United States. BOT has been a controlling stockholder of Benihana since its incorporation.[3]

3. In the Amended Verified Complaint ("Complaint") BOT states that it "brings this action both individually and derivatively on behalf of Benihana, Inc. and its stockholders." Compl. at 1. Certain Defendants moved to dismiss any derivative claims in the original complaint on the ground that they were not derivative in nature. In response, BOT confirmed that Counts I—III are direct claims, but asserted that Counts IV, for breach of the duty of loyalty, and V, for breach of the duty of care, are both direct and derivative in nature.

Initially, Rocky Aoki owned 100% of BOT and thereby indirectly controlled Benihana. In 1998, after he pled guilty to insider trading charges unrelated to Benihana, Rocky Aoki put his 100% ownership interest of BOT into the Benihana Protective Trust (the "Trust") to avoid regulatory problems regarding Benihana's liquor licenses stemming from his status as a convicted felon. Defendant Dornbush, a trusted friend and the family attorney, advised Rocky Aoki in that matter. The trustees of the Trust are Rocky Aoki's three children, Kana Aoki Nootenboom ("Kana Aoki"), Kyle Aoki and Kevin Aoki, and, until recently, Defendant Dornbush. The directors of BOT are Kana Aoki, Defendant Dornbush, and until recently, Kevin Aoki and Defendant Yoshimoto. Kevin Aoki also serves as a vice president of marketing and a director of Benihana.[4]

Benihana has two classes of common stock outstanding, common stock ("Common Stock") and Class A common stock. Benihana has 3,018,979 shares of Common Stock issued and outstanding. Each share of Common Stock entitles its holder to one vote. Additionally, Benihana has 6,134,225 shares of Class A common stock issued and outstanding, with each share having 1/10 vote. The holders of Class A common stock have the right to elect 25% of the Benihana Board of Directors, rounded up to the nearest whole director.[5] The holders of the Common Stock elect the remaining directors.[6]

BOT owns 50.9%, or 1,535,668 shares, of Benihana's Common Stock and 2%, or 116,754 shares, of Benihana's Class A common stock. Before the BFC Transaction, BOT also had 50.9% of the Common Stock voting power. The Transaction caused a decrease in BOT's voting power in two steps: first to 42.5% and then to 36.5%.

Since June 2003, Benihana has had a nine member board of directors (the "Benihana Board" or "Board"). Defendants Abdo, Becker, Dornbush, Pine, Sano, Schwartz, Sturges and Yoshimoto are all directors of Benihana. The Benihana Board is classified; the holders of Class A common stock elect three directors, and the holders of Common Stock elect six directors. Each year the stockholders elect one third of the directors for three year terms, including one director elected by Class A common stockholders.

Defendant BFC is a publicly traded Florida corporation with its principal place

Defendants based their motion in part on technical defects in Counts IV and V that BOT corrected in its Amended Verified Complaint, filed October 8, 2004.

In assessing whether a claim is direct or derivative the Court must determine "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)." *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del.2004). Certain aspects of Counts IV and V are derivative. In particular, Count IV alleges that the Director Defendants engaged in acts of unfair dealing and consummated the BFC Transaction for an unfair price. That is a derivative claim. *Noerr v. Greenwood*, 1997 WL 419633, at *2 (Del.Ch. July 16, 1997) (characterizing as derivative a claim for unfair dealing in connection with a self-interested option issuance). Count V alleges, among other things, that the Director Defendants breached their fiduciary duties to Benihana by engaging in a self-dealing transaction without exercising the appropriate quantum of care. That, too, is a derivative claim. *Levine v. Smith*, 1989 WL 150784, at *1 (Del.Ch. Nov.27, 1989). Defendants' arguments to the contrary are unpersuasive. Therefore, Defendants' motion to dismiss the derivative claims is denied.

4. Kyle Aoki also is employed at Benihana.

5. PTO at 3.

6. *Id.*

of business in Florida. BFC is a holding company for various investments, including a 55% controlling ownership interest in Levitt Corporation, which in turn has a 37% ownership interest in Bluegreen Corporation. BFC invests in companies they like and can understand and that have managements that BFC admires as having a high degree of integrity and character.[7] BFC does not get involved in the management of the companies they invest in or frequently change boards of directors or management.[8] Abdo's job at BFC is to identify opportunities for investments in companies that are run by people BFC would admire.[9]

At all times material to this case, Abdo was a director and the vice chairman of BFC and owned approximately 30% of its stock. He and BFC Chairman, Alan Levan, together control BFC.[10] Abdo also serves as president of Levitt Corporation and vice chairman of the boards of directors of both Levitt and Bluegreen.

Abdo has long had an interest in Benihana.[11] He was appointed to the Board in 1991 as an independent director.[12] On the day he was nominated to the Board he purchased 10,000 shares of Benihana stock.[13] He subsequently purchased more Benihana stock.[14] After it was announced that Rocky Aoki would resign from the board due to an insider trading conviction Abdo told Dornbush that if Rocky sold any

of his stock he would have an interest in purchasing it.[15] That is the only situation Abdo recalled where he initiated a conversation in which he expressed an interest in purchasing stock from Rocky Aoki or BOT.[16]

Defendant Dornbush is a director and corporate secretary of Benihana and, in effect, acts as its general counsel. He served as counsel to Benihana in the BFC Transaction. Together with Abdo, Dornbush also serves as a director on Levitt's board.

Defendant Schwartz is a director of Benihana as well as its president and chief executive officer. Thus, Schwartz receives a significant portion of his income from his salary, bonuses and options in Benihana. In addition, Schwartz is a partner in the Dorsan Group, a financial consulting firm whose other partners include Defendants Dornbush and Sano.

Defendant Yoshimoto works for Benihana as Executive Vice President of Restaurant Operations. His position is subordinate to Dornbush and Schwartz.

Both Yoshimoto and Schwartz have multi-year employment contracts that guarantee their annual salaries and require the Company to pay all salary remaining under the contract within 20 days of any termination without cause.[17] Yoshimoto's

---

7. Tr. at 826 (Abdo). Citations in this form refer to the trial transcript and, where it is unclear from the text, the witness testifying.

8. *Id.*

9. Tr. at 758 (Abdo). Abdo identified Benihana as one of those companies.

10. PTO, Admitted Fact 9.

11. Tr. at 840 (Abdo).

12. Tr. at 759–60 (Abdo).

13. Tr. at 840.

14. *Id.*

15. Tr. at 768, 840–42 (Abdo).

16. Tr. at 768.

17. *See* Benihana, Inc. Form 10–K/A, filed Sept. 4, 2001 for fiscal year ending Apr. 1, 2001, at Ex. 10.07, § 8 (Schwartz) and Ex. 10.12, § 8 (Yoshimoto), http://www.sec.gov/Archives/edgar/data/9 35226/00009352260150 0010-/form10-k2001.t xt; *see also* Benihana, Inc. Form 10–K, filed July 2, 2004 for fiscal year ending March 28, 2004, at Ex. 10.18 (renewal of Schwartz's employment contract

contract expires in 2006, Schwartz's in 2009.[18]

In addition to being a director of Benihana, Defendant Becker is a director of Bluegreen Corporation along with Abdo.

## B. Concern Regarding Future Control of BOT

In early 2003, Rocky Aoki became displeased with the actions of his trusted advisors and members of his family to whom he had ceded control of BOT (and indirect control of Benihana).[19] Around this time period, Rocky Aoki first retained counsel other than Dornbush to advise him with regard to the Trust. Rocky even suggested that Dornbush and Yoshimoto resign as directors of Benihana. In or around August 2003, Rocky Aoki also prepared a codicil to his will that provided for distribution of all of BOT's stock to his new wife, Keiko Aoki, 25% passing to her in fee simple and 75% passing to her in the form of a life estate with the remainder to his children. Thus, upon Rocky Aoki's death, complete control of BOT and indirect control of Benihana would pass to Keiko Aoki and not to his children. This development created varying degrees of concern among not only Kevin and Kana Aoki, two of Rocky Aoki's children who served as trustees of the Trust, but also some members of the Benihana Board.[20]

According to Schwartz, Benihana frequently received comments from investors and Wall Street about changing from two classes of common stock to one, because it would improve the liquidity of Benihana.[21] Due to the two tiered structure of Benihana's stock Schwartz always asked Dornbush "whether [he] thought the trust would be interested in selling any of their BOT shares."[22] Dornbush always responded to these inquiries by saying that BOT would not sell their shares during Rocky's lifetime.[23]

The Certificate of Incorporation provides that if the number of shares of Common Stock falls below a specified threshold (12 1/2%) of the total number of shares of Class A and Common Stock, then the Class A stock not only votes separately for 25% of the directors, but also votes with the Common Stock for the remaining 75% of the directors. In all cases, however, the Class A stock would have only a 1/10 vote.

In late August 2003, Dornbush and Schwartz examined different means by which they could trigger the provision of the certificate which would cause the Common Stock and Class A stock to vote together for the directors previously elected by the Common Stock alone.[24] In one scenario, Schwartz determined that Benihana would have to issue 16.5 million Class A shares to meet the threshold in the Certificate. Such a stock issuance

through 2009), http://www.sec.gov/Archives/edgar/data/9 35226/000093522 604000019/form1 0–k2004.txt.

18. *Id.*

19. *See, e.g.,* JX 6, 10; Tr. at 771 (Abdo).

20. *See* Tr. at 149–50, 153–54 (Kana Aoki), 235, 254 (Kevin Aoki). Dornbush testified that he told Schwartz that if Keiko were hostile to management, "you [referring to Schwartz] and the other executives have employment agreements in place, and you'll

have to weather the storm or do what you want to do at that point in time." Dornbush Dep. at 164. Schwartz, the CEO of Benihana, is 63 years old and has an employment agreement with Benihana that prevents his termination except for cause until 2009.

21. Tr. at 29 (Schwartz).

22. Schwartz Dep. at 69.

23. *Id.*

24. JX 21, 22, 23; Tr. at 28–30 (Schwartz).

would have reduced BOT's percentage of the vote to approximately 29%. Schwartz asked Dornbush whether that scenario was feasible. Dornbush responded that it would not be and suggested that there would not be a legitimate business purpose for issuing that number of shares.[25]

### 1. The proposal of an option to purchase BOT's interest in Benihana

On September 10, 2003, shortly after learning of the change to his father's will, Kevin Aoki had dinner with Abdo and discussed the growing tension among the Aoki family. Kevin told Abdo that the amount of control their father's new wife exerted over their father disturbed the Aoki children.[26] The parties dispute whether Abdo, on the prompting of Dornbush, approached Kevin Aoki at the September 2003 dinner about purchasing BOT's stock in Benihana.

In the second half of 2003 and into 2004, the Aoki children who served as trustees experienced many pressures and concerns as a result of their father's changed behavior after his remarriage. For example, after Rocky Aoki married Keiko, he decided that he no longer wanted to pay the premiums on his life insurance policies that benefited his children.[27] Further, against their father's wishes, Kevin and Kana Aoki, who served as trustees of an insurance trust that owned Rocky Aoki's life insurance policies, refused to cancel the policies. Since that time Kevin and Kana Aoki have used the cash surrender value of the policies to pay the premiums that Rocky Aoki refuses to pay.[28] Though the Aoki children tried to discuss this matter with their father, their relationship had deteriorated to the point where Rocky Aoki, through counsel, informed them that he would not meet with them outside of Keiko's presence.[29]

By early 2004, the Aoki children, upon the recommendation of Dornbush, had retained separate counsel to represent them. In that context, the Aoki children met with Dornbush in late January and mid March 2004 (the "Option Meetings"). The Aoki children sought a solution to protect themselves against their father's threats and pressures.[30] Additionally, they wanted to protect Benihana, as well as Kevin and Kyle's jobs at Benihana, from Keiko's control and find a way to pay the insurance premiums.[31] At the March 2004 meeting, Dornbush suggested issuing an option to purchase BOT's interest in Benihana. This effectively would have shielded Benihana, and Kyle and Kevin's jobs, from Keiko's control and provided cash to BOT so the children could pay Rocky's life insurance premiums. The Aoki children, however, felt uncomfortable selling BOT's interest in Benihana during their father's lifetime, so they suggested that the option would be exercisable only upon Rocky's deathbed. The Aoki children also wanted to "[k]eep [the] door open for dad," i.e., provide a mechanism through which they could cancel the option if they reconciled with their father.[32] Dornbush expressed

---

25. Tr. at 1053–55 (Dornbush).

26. Tr. at 245–46 (Kevin Aoki).

27. *See* DX 122.

28. Tr. at 150 (Kana Aoki).

29. Tr. at 249 (Kevin Aoki).

30. *See* DX 123; Tr. at 160–61, 192 (Kana discussing Rocky Aoki's threat to cut her and Kevin out of his will entirely if they did not do as he requested with regard to the Trust).

31. Tr. at 250–51 (Kevin Aoki), 1027–28 (Dornbush).

32. DX 123. The record is unclear as to how the exercisability of the proposed option would relate to Rocky Aoki's health or even his death. The parties never reached the

skepticism about finding a buyer willing to accept a transaction with such a cancellation feature. In fact, Dornbush "identified [Abdo] as the only person [he knew] who would entertain buying" such an option.[33] Abdo knew of the pressure Rocky Aoki had placed on Kevin Aoki, and Dornbush felt that Abdo "was truly supportive" of Kevin.[34]

After the meeting Dornbush had with Kyle, Kevin and Kana Aoki, Dornbush and Kevin met with Abdo for lunch in March 2004. Kevin Aoki denies that he "asked [Abdo] if he would be interested in buying cancelable options for the purchase of BOT shares in Benihana," [35] at the March 2004 lunch meeting.

I do not find this testimony credible because both Kevin's sister, Kana Aoki, and Dornbush testified that approaching Abdo with regard to purchasing a cancelable option was exactly the course of action the Aoki children agreed upon at the Option Meetings.[36] Therefore, I find that Kevin Aoki approached Abdo at the March 2004 lunch meeting about purchasing an option for the BOT shares.

In addition, I find that there is no credible evidence that Abdo approached Kevin Aoki at the September 2003 dinner meeting about purchasing BOT's interest in Benihana. The only evidence in support of that allegation is the testimony of Kevin Aoki. Having concluded that Kevin's recollection of who approached whom about purchasing the option at the March 2004

lunch meeting is faulty, I likewise consider unreliable his testimony regarding what transpired at the September 2003 dinner meeting. Further, I find Abdo's testimony with regard to these two meetings credible and convincing. Abdo is vice chairman of BFC's board of directors, president of Levitt Corporation and vice chairman of the boards of directors of both Levitt and Bluegreen. As discussed below, he had no need, financial or otherwise, to keep his director position at Benihana. Though he may have found an opportunity to acquire BOT's Benihana Common Stock attractive, the cancellation feature of the option offered by the Aoki children made the proposed investment much less enticing. Thus, I accept Abdo's testimony regarding what transpired at the September 2003 dinner meeting and the March 2004 lunch meeting.

## C. The State of Benihana's Businesses

In 2003, Benihana realized that it needed to renovate many of its restaurant facilities because they were aging and quickly becoming outmoded in the face of new competition in the marketplace.[37] Benihana hired WD Partners to evaluate, plan and design the necessary renovations to help the Company maintain its competitive position within the market. WD Partners determined that Benihana needed to construct new teppan and sushi restaurants [38] as well as renovate its older restaurants. They projected that these construction and renovation efforts (the "Construction and

---

stage of exchanging a written proposal for such an option.

**33.** Tr. at 1028.

**34.** Tr. at 1029.

**35.** Tr. at 256.

**36.** *See* Tr. at 182–84 (Kana Aoki), 1028 (Dornbush).

**37.** Tr. at 553–54, 561 (Burris). Mark Burris is Benihana's CFO.

**38.** Benihana restaurants typically use teppan style cooking, which involves cooking on a large griddle usually built into the diner's table. In recent years Benihana acquired the Ra and Haru restaurant chains, which focus more on sushi style food preparation.

Renovation Plan") would last at least five years.

Implementation of the Construction and Renovation Plan would require capital. In 2003, Benihana had an existing line of credit with Wachovia.[39] Mark Burris, Benihana's CFO, approached Wachovia to determine their ability to finance Benihana's Construction and Renovation Plan. On October 17, 2003, Burris wrote a file memo with a copy to Schwartz that analyzed Wachovia's proposal for providing debt financing to Benihana. Burris concluded that, "the need for additional financing is clear if we are to continue capex [capital expenditures] at our projected rate."[40] At trial, Burris explained that he felt uncomfortable relying solely upon the Wachovia proposal to satisfy Benihana's financing needs because it contained a provision limiting the amount Benihana could borrow to 1.5 times earnings before interest, taxes, depreciation, and amortization ("EBITDA"). This restriction on the financing plan, which spanned five years, threatened to limit substantially Benihana's ability to borrow funds.

To illustrate, though Wachovia offered a line of credit of $60 million, Benihana could borrow that amount only if its EBITDA equaled or exceeded $40 million. In 2003, however, Benihana's EBITDA was far below that amount. Moreover, if Benihana's earnings declined in the near term,[41] the covenant could limit further its ability to borrow funds from Wachovia. Consequently, Benihana's EBITDA represented an equally important figure to the $60 million cap in considering the proposed Wachovia financing. In fact, in his memo to the file Burris stated that, "it seems unlikely that we will use the entire $60 million availability under any circumstances unless there is improvement to profitability."[42]

### 1. Financing alternatives explored

Given the less than satisfactory financing option offered by Wachovia,[43] Benihana retained the investment banking firm Morgan Joseph & Co., Inc. ("Morgan Joseph") to determine what other financing options the Company might use to carry out its five year Construction and Renovation Plan.[44] As a part of its due diligence, Morgan Joseph met with Benihana's management, including Schwartz, Kevin Aoki and Burris, to gain a better understanding of their views regarding the need for renovation of the teppan style restaurants, acquisition potential, and expansion of the Ra sushi bars.[45]

After meeting with management, Morgan Joseph studied Benihana's financial projections and conducted sensitivity analyses. Morgan Joseph determined that because Benihana

---

39. Tr. at 558 (Burris).

40. JX 29.

41. The evidence indicated that many events outside of the Company's control can affect Benihana's earnings. Consumers view Benihana as a restaurant to go to for celebratory occasions. Therefore, periods of time when the social climate does not support celebrating, such as during the gulf war and post 9/11, can negatively affect Benihana's earnings. *See* Tr. at 556–57 (Burris).

42. JX 29.

43. *Id.;* Schwartz Dep. at 176–77.

44. JX 30; Tr. at 38–39 (Schwartz). In the past, Morgan Joseph had given Benihana financial advice in the form of fairness opinions and assistance on equity offerings. Tr. at 618–19 (Joseph). Fred Joseph, the Morgan Joseph representative who advised Benihana regarding the matters at issue in this litigation, testified at trial.

45. Tr. at 620–21 (Joseph).

had not in recent years made its projections.... [Morgan Joseph had become] very concerned about embarking on an extensive refurbishment plan, needing to do more acquisitions, if you could find appropriate acquisitions, and having a very close call in terms of capital availability depending on operating cash flow.[46]

Morgan Joseph wanted to ensure that Benihana did not embark on its five year Construction and Renovation Plan, which everyone including Kevin Aoki agreed was necessary to remain competitive, only to run out of capital before its completion and end up as a bankruptcy candidate.[47]

### 2. January 9 meeting of the Executive Committee

On January 9, 2004, Morgan Joseph met with the Executive Committee, comprised of Abdo, Schwartz and Dornbush,[48] to discuss financing vehicles available to Benihana to fund the Construction and Renovation Plan. Morgan Joseph expressed its concern regarding the "closeness of the company's capital needs to its availability" and the vulnerability of their projected growth forecasts, which depended on the success of the renovation plan.[49] The Executive Committee and Morgan Joseph discussed their respective goals and concerns, as well as various financing alternatives available to the Company. These alternatives included bank debt, high yield notes, convertible debt or preferred stock, traditional equity financing and sale/lease-back options.[50]

The parties all agree that Benihana was conservatively leveraged during the relevant time period.[51]

### 3. January 29 meeting of the Benihana Board

Following the January 9, 2004 meeting, Morgan Joseph decided to recommend convertible preferred stock as an appropriate financing vehicle for Benihana and created a board book that analyzed the recommended stock issuance and set forth the anticipated terms for it. Morgan Joseph presented the board book to the Benihana Board at a January 29, 2004 meeting. Once again, they reviewed the financing alternatives of bank debt, high yield notes, convertible debt or preferred stock, traditional equity financing and sale/leaseback options, and the Board discussed them.[52] Morgan Joseph recommended that Benihana obtain equity financing first to gain flexibility, then use the equity financing as leverage to negotiate better terms on their existing line of credit with Wachovia.[53] According to Joseph, "the oldest rule in our business is you raise equity when you can, not when you need it. And Benihana's stock had been doing okay. The markets were okay. We thought we could do an equity placement."[54] Morgan Joseph recommended a convertible preferred stock specifically because it felt "that adding the additional long-term capital match[ed] the company's long term needs [for capital expenditures,] .... provide[d] the flexibility for the company to grow

---

46. Tr. at 621.

47. Tr. at 621–22.

48. See JX 32.

49. Tr. at 623. See also JX 36 (board book prepared by Morgan Joseph for the January 9 Executive Committee meeting).

50. See JX 36.

51. Tr. at 106 (Schwartz), 298–99 (Atkins), 703 (Joseph).

52. See JX 37; Tr. at 638–39 (Joseph).

53. Tr. at 630–31.

54. Tr. at 631.

internally and pursue the other opportunities [i.e., acquisitions] .... [a]nd reduce[d][the] company's dependence on bank debt."[55] The Benihana directors were told to take the board books home to study and deliberate.

### 4. February 17 meeting of the Benihana Board

On February 17, 2004, the Benihana Board met again to discuss the terms of the recommended convertible preferred stock issuance. Morgan Joseph discussed the feasibility of obtaining certain terms the Company wanted. For example, during the meeting, Morgan Joseph noted the following areas in which they anticipated having to make concessions: (1) that it "was going to have quite a battle to keep the investor from putting performance criteria on the company as a condition of executing the second takedown;" (2) that it would most likely have to pay a coupon, or dividend, of "probably six percent, plus or minus a half;" (3) that the conversion premium would probably be "20%, plus or minus 2½%;" (4) that Benihana would have a difficult time getting a perpetual maturity for the issuance, and that the notes typically have a maturity range of 5 to 10 years; and (5) that Benihana will likely have to "give up two board seats."[56] Thus, the Board understood that, while Morgan Joseph would endeavor to negotiate the best deal for Benihana, several of the terms they had discussed were more akin to a "wish list."[57]

At the conclusion of the February 17 meeting, the Benihana Board decided to pursue convertible preferred stock as an additional means of financing. Abdo attended both the January 29 and February 17 meetings. At the February 17 meeting Morgan Joseph proposed that the convertible preferred stock should have immediate voting rights as though they had been converted.[58] Joseph explained their reasoning as follows: "Someone is not going to come in, put in money, be illiquid, have a larger holder and not have their voting rights from Day 1."[59]

The convertible preferred stock discussed at the February 17 meeting differed in certain respects from the three classes of preferred stock (Series A, A–1 and A–2) Benihana previously had authorized. None of those classes carries with it the right to a directorship, voting rights or preemptive rights.[60]

### 5. Actual versus projected net debt figures

The board books used in the January 29 and February 17 meetings contained a "base case" scenario that calculated capital shortfalls if Benihana relied solely upon the proposed Wachovia line of credit. Morgan Joseph based its figures for this "base case" scenario on calculations of net debt by Burris that included several renovation projects that did not occur during Benihana's fiscal year 2004 because of zoning and other temporary delays.[61] Benihana did not cancel these projects, but rather deferred them to a later point in time. It also did not consider the attendant delay

**55.** Tr. at 640–41.

**56.** Tr. at 76–78 (Schwartz), 649 (Joseph).

**57.** Schwartz Dep. at 274.

**58.** Tr. at 54–55 (Schwartz).

**59.** Tr. at 650; *see also* Tr. at 646–47 (Joseph) (regarding conversion right to Common Stock), 797 (Abdo).

**60.** *See* JX 96 (Stock Purchase Agreement).

**61.** *See* Tr. at 651.

to cause a fundamental change in the Company's need for capital.[62]

By the February 17 Board meeting Benihana's management knew of the change in net debt figures, but failed to mention it to Morgan Joseph. Morgan Joseph later discovered the discrepancy when it conducted additional due diligence in connection with preparing the private placement memorandum.[63] This discovery, however, did not alter Morgan Joseph's opinion that Benihana should not rely solely on the Wachovia line of credit to finance the Construction and Renovation Plan. Fred Joseph testified that:

> I wasn't obsessed by the slight shortfall [created by the projected, not actual, net debt figures]. I was very concerned about the fact [that] there just wasn't enough room in the Wachovia proposal and, you know, a terrorist attack, two-percent decline in sales growth and the company would have been in real trouble on its cap[e]x requirements.[64]

Additionally, Morgan Joseph preferred a flexible strategy because it believed that Benihana needed flexibility to take advantage of attractive acquisition opportunities that might present themselves.[65] In fact, Benihana ended up not only with lower actual net debt figures for fiscal year 2004, but also lower EBITDA figures. The lower net debt figures would have made more funds available to Benihana to borrow under the Wachovia offer. The lower EBITDA figures, however, would have limited the amount of those funds. Thus, changes in these figures offset each other to a certain extent.[66]

Morgan Joseph corrected the net debt figures in the board books it created going forward.

### D. Abdo Approaches Morgan Joseph on Behalf of BFC

Shortly after the February 17 Board meeting Abdo talked to his partner Alan Levan about having BFC attempt to purchase the preferred stock Benihana planned to issue to finance the Construction and Renovation Plan.[67] Levan responded that he thought it was a good deal and trusted Abdo's instincts regarding the investment.[68]

Two or three days after the February 17 meeting, Abdo contacted Joseph and told him BFC had an interest in purchasing the Benihana convertible preferred stock being offered to finance the Construction and Renovation Plan.[69] Joseph then contacted Benihana which welcomed Abdo's involvement in the Transaction.[70]

In early April 2004, Morgan Joseph sent its private placement memorandum to BFC and negotiations began.[71] Although Abdo did not indicate whether BFC generally accepted the term sheet contained in the private placement memorandum, the parties agreed not to shop the issuance to anyone else for a short period to foster more productive negotiations with BFC.[72]

Morgan Joseph negotiated on behalf of Benihana. Abdo negotiated on behalf of

---

62. Tr. at 67 (Schwartz), 657 (Joseph).

63. Tr. at 651.

64. Tr. at 636.

65. Tr. at 631–32 (Joseph).

66. Tr. at 659 (Joseph).

67. Tr. at 799–800 (Abdo).

68. *Id.*

69. Tr. at. 800, 866 (Abdo).

70. Tr. at 801 (Abdo).

71. Tr. at 72 (Schwartz).

72. Tr. at 652 (Joseph).

BFC. Morgan Joseph had no prior business relations with Abdo or BFC. In fact, Morgan Joseph directly competed with Ryan Beck, an investment bank that BFC controlled.[73]

### 1. Negotiation of the convertible preferred stock issuance

Negotiations between BFC (Abdo) and Benihana (Morgan Joseph) continued through the end of April 2004. The ultimate terms of the BFC Transaction are reflected in a stock purchase agreement (the "Stock Purchase Agreement" or "SPA"). Those terms include the issuance of 800,000 shares of convertible preferred stock for $20 million in two separate tranches of $10 million apiece.[74] The second tranche would issue within one to three years after the first.[75]

BFC negotiated to obtain the following terms: (1) the right to require Benihana to draw down the second tranche of convertible preferred stock; (2) BFC's right to one director seat on the Benihana Board and an additional seat if Benihana missed

its dividend for two consecutive quarters;[76] (3) BFC's preemptive right to purchase a proportional amount of any new voting securities issued by Benihana;[77] (4) BFC's right to require Benihana to redeem the full $20 million of convertible preferred stock at any time after 10 years;[78] (5) anti-dilution and liquidation provisions;[79] (6) BFC's right to a standby fee;[80] and (7) BFC's right to immediately vote on all matters, including elections of directors, with the voting power associated with the amount of Common Stock into which their preferred stock was convertible, even if such stock has not yet been converted.

For its part, Morgan Joseph negotiated several terms that they considered beneficial to Benihana. Those terms included: (1) no performance criteria could be placed on Benihana as a condition of executing the second tranche; (2) a coupon rate, or dividend, of five percent;[81] and (3) a conversion price of 115% of the original volume based on a 10 day average *before* the announcement of the Transaction.[82]

73. Tr. at 656 (Joseph).

74. Tr. at 662 (Joseph). Morgan Joseph had the authority to negotiate whether the purchase price would be paid in cash or common stock. *Id.*

75. *Id.* Benihana reportedly issued the second tranche on August 4, 2005. *See* Letter to Court from C. Barr Flinn, dated August 22, 2005.

76. *See* Tr. at 664 (Joseph). The parties negotiated that Benihana would not add an additional director seat to the Board. Instead, Abdo would continue to serve on the Board but serve in the capacity of BFC's representative. Additionally, though BFC obtained the right to receive an additional director seat after two consecutive quarters of missed dividends, rather than four as Benihana initially hoped for, Morgan Joseph considered the negotiated term, "fairly standard." *Id.*

77. PTO at ¶ 23. BFC requested this term and Benihana did not object. *See* Tr. at 663–64 (Joseph).

78. This result was consistent with Morgan Joseph's prediction that it would be difficult for Benihana to get a perpetual maturity in the issuance. Tr. at 649. Additionally, Morgan Joseph obtained "the right for [Benihana] to pay that redemption in stock if they wanted to at their option." Tr. at 654.

79. Tr. at 663, 665 (Joseph). These terms were considered very standard.

80. Tr. at 665. Benihana wanted to avoid this, but, in the end, Morgan Joseph opined that it was a reasonable fee.

81. Tr. at 649. This was better than the "six percent, plus or minus a half" Morgan Joseph told Benihana to be prepared to pay.

82. *See* Tr. at 663 (Joseph), 804 (Abdo). This term was likely to benefit Benihana because

Morgan Joseph believed that Benihana got what they wanted through the negotiations. Joseph testified that he

> ended up quite satisfied that we had a transaction that, in what [he] considered material aspects, the amount, the two takedowns, the dividend and conversion premium. This sort of hierarchy of importance and you can get hung up on all these points, but you got to remember what's most important. On the important points we ended up where we wanted to be.[83]

Schwartz sent the negotiated term sheet to the Board on April 30, 2004, but did not indicate that BFC was the other party to the negotiations.[84] Schwartz, however, informally told Becker, Sturges, Sano, and possibly Pine of BFC's role as the counterparty before the May 6, 2004 Board meeting.[85]

### E.　The May 6 Benihana Board Meeting

On May 6, 2004, the Benihana Board met again to consider the convertible preferred stock issuance. At this meeting, the entire Board formally was informed of BFC's negotiations with Benihana. Abdo made a presentation on behalf of BFC and explained its business philosophy. He then excused himself from the remainder of the meeting. Morgan Joseph circulated an updated board book that contained the negotiated terms and corrected net debt figures. They reviewed the new terms with the Board and pointed out the changes in the net debt figures.[86] In addition, the Board specifically discussed changes that had been made with regard to the conversion price and preemptive rights.[87]

The Benihana Board, however, never received the private placement memorandum that Morgan Joseph prepared after the February 17 Board meeting and gave to BFC in April 2004. Therefore, the Board members were only familiar with the proposed terms discussed at the January 29 and February 17 Board meetings and the negotiated terms presented to them at the May 6 meeting. Morgan Joseph told the Board that no significant changes to the terms had been made.[88] Additionally, though Pine had inquired about Abdo's involvement in the negotiations, the Benihana Board was not informed that Abdo himself negotiated the terms on behalf of BFC.[89] The Board did know, however, of Abdo's position as a principal of BFC and the ultimate decision making role he presumably had over BFC's investments.[90]

At the conclusion of the May 6 meeting, the Board voted to approve the BFC Transaction subject to receipt of a fairness opinion. Dornbush and Kevin Aoki attended the meeting and participated in the discussions but abstained from voting. All six remaining directors voted in favor of the Transaction.

---

pre-announcement prices generally exceed pre-closing prices. In fact, the pre-announcement conversion price in this instance was higher.

83.　Tr. at 655.

84.　Tr. at 90 (Schwartz).

85.　Tr. at 89–90, 92, 93.

86.　Tr. at 657.

87.　Tr. at 96 (Schwartz).

88.　Tr. at 95–96 (Schwartz), 1062–63 (Dornbush).

89.　Tr. at 95 (Schwartz).

90.　In fact Abdo made the presentation to the board on behalf of BFC at the May 6 meeting. JX 66 at 2. See also JX 68.

## F. Closing of the BFC Transaction

On May 20, 2004, the Benihana Board met again to consider the BFC Transaction, which now was supported by a favorable fairness opinion from Morgan Joseph. The Board then approved the transaction. On June 8, 2004, Schwartz executed the Stock Purchase Agreement on behalf of Benihana, and Abdo executed it on behalf of BFC.

### 1. BOT's concern over the dilutive effect of the BFC Transaction

After the May 6 Board meeting, Kevin Aoki approached Schwartz, Abdo and Dornbush to inquire if either his father or BOT could finance the second tranche of the BFC Transaction in order to avoid dilution of BOT's interest in Benihana.[91] The proposals Kevin Aoki made, however, were not realistic. Despite Rocky Aoki's long history with the Company and desire to exert control over it, he had "never brought financing to the table." [92] Consequently, management did not view Rocky as a viable funding source.[93] The other scenarios Kevin presented as to how BOT could raise the necessary capital to participate in the second tranche demonstrated his lack of financial expertise and sophistication, and were likely to result in adverse tax consequences.[94] Furthermore, BFC had no motivation to give up the second tranche for which it had just negotiated.

In mid-May 2004, after learning of the BFC Transaction, Rocky Aoki discussed his displeasure regarding it with Kevin. The trustees of the Trust objected to the dilutive effect of the Transaction as well.[95] Because of concern for Kevin and Kyle Aoki's work environment, however, the trustees delegated the task of complaining about the BFC Transaction to Ken Podziba, a family friend.[96] Thereafter, representatives of the Trust and Rocky Aoki communicated their objections regarding the BFC Transaction to the Benihana Board and recommended alternative financing offers for Benihana's consideration.[97]

### 2. Alternative financing offers

On May 28, 2004, Benihana received an offer from Yamano Holdings (the "Yamano Offer").[98] Schwartz asked Becker, Pine and Sturges to form an independent ad hoc committee to review the offer.[99] Schwartz also sent the Yamano Offer to Morgan Joseph for evaluation.[100] Benihana reviewed both transactions quickly because it did not want to risk losing the BFC Transaction, which the Board had already announced.[101] Though the Yamano Offer terms appeared to differ from the BFC Transaction only in that the preferred would convert into Class A common stock rather than Common Stock, Yamano stated that it would need to conduct due

91. Tr. at 226–28 (Kevin Aoki).

92. Tr. at 227 (Kevin Aoki).

93. *Id.*

94. Tr. at 228 (Kevin Aoki).

95. Tr. at 142 (Kana Aoki).

96. *Id.*

97. *See* JX 88.

98. Defendants objected to the admission of this offer on hearsay grounds. Tr. at 682–84.

After considering this objection and consistent with my ruling at trial (Tr. at 685–86), I will admit PX 78 for the limited purpose of showing what was submitted to the Board, but not for the truth of the matter asserted in the document.

99. Tr. at 117–19 (Schwartz).

100. *Id.*

101. *Id.*

diligence and then possibly negotiate the terms further.[102] The ad hoc committee concluded that the Yamano Offer was inferior because it was "very much underdeveloped" and an important term, the conversion price, was "on its face inferior." [103] Additionally, Morgan Joseph informed Benihana that it considered the Yamano Offer inferior to the BFC Transaction and not worth pursuing.[104]

On June 3, 2004, Benihana received an offer from Cornell Capital Partners (the "Cornell Offer").[105] Schwartz submitted this proposal to Morgan Joseph for review. Morgan Joseph concluded that the short term Cornell Offer was inappropriate to finance Benihana's five year Construction and Renovation Plan.[106]

Finally, on June 4, 2004, Benihana received a letter from Trinity Capital.[107] Once again, Benihana sent this letter to Morgan Joseph for review. Morgan Joseph concluded that Trinity Capital's letter did not even constitute an offer of financing; rather, it was "another investment bank saying 'We'd like to be your investment bank.' " Additionally, Morgan Jo-

seph opined that the suggested financing terms were "just flat out ridiculous." [108]

On June 11, 2004, the Benihana Board met to consider these three alternative proposals. The Board also discussed BOT's concerns regarding the dilutive effect of the BFC Transaction.[109] The Board determined not to pursue any of the alternative proposals and voted to ratify the BFC Transaction.[110]

### 3. Filing of the Certificate of Designations

Benihana's Certificate of Incorporation gives the Benihana Board the power to issue "blank check" preferred stock.[111] Accordingly, and as required by § 4($l$) of the Stock Purchase Agreement, Benihana filed a Certificate of Designations, Preferences and Rights of Series B Convertible Preferred Stock of Benihana ("Certificate of Designations") with the Delaware Secretary of State on June 29, 2004.[112] This action immediately reduced BOT's voting interest from 50.9% to 42.5%, and then further reduced it to 36.5% in or around August 2005, when BFC took down the second tranche. Likewise, BFC acquired

---

**102.** Tr. at 928–29 (Sturges).

**103.** *Id.* Joseph testified that he believed the Yamano Offer was inferior because he "was very much put off by the fact it was subject to due diligence. When someone comes in and they want to tell you they want to do a deal, you have a bird in hand. And there's the subject of due diligence. That can be an immense risk, unless they're a well-known, prestigious institution; and you know they know all they're going to know about the company." Tr. at 678–79.

**104.** Tr. at 124 (Schwartz).

**105.** PX 86. As with PX 78, I will admit PX 86 to the extent it shows what Cornell said and the proposal it put forward, but not for the truth of the matters asserted in the document.

**106.** Tr. at 678–79; This offer had short term financing which even Cornell's witness admit-

ted would not be appropriate for long term capital expenditures. Kanakis Dep. at 48–49, 52–53.

**107.** PX 82. At the pretrial conference Defendants objected to the admission of this offer on hearsay grounds. *See supra* n. 98. I overrule Defendants' objection for the same reasons as the Cornell Offer.

**108.** PX 678–79.

**109.** *See* JX 88.

**110.** *See id.* Abdo, Dornbush and Kevin Aoki abstained from the vote.

**111.** *See* Certificate of Incorporation, Art. 4(b).

**112.** *See* JX 96.

a 16.5% voting interest in Benihana when the Certificate of Designations was filed, which increased to 28.3% upon issuance of the second tranche.

### 4. Procedural History

The Complaint was filed July 2, 2004 along with motions for expedited proceedings and a preliminary injunction.[113] Defendants moved to dismiss on July 28, 2004. They filed further motions to dismiss on October 15 and 18. At trial on November 14, 2004, I partially denied Defendants motion to dismiss. In February 2005, I issued a memorandum opinion denying Defendants motion to dismiss as to BFC under Chancery Court Rules 12(b)(2) for lack of personal jurisdiction and 12(b)(5) for insufficient service of process, and as to all remaining Defendants under Rule 19 for failure to join an indispensable party.[114] Regarding Defendants' motion to dismiss the derivative claims, I found that the Complaint met all pleading requirements under Rule 23.1, but deferred decision regarding whether claims IV and V are derivative in nature pending further development of the case.[115]

### G. Subsequent review of the BFC Transaction

On October 27, 2004, Benihana's Audit Committee, consisting of Becker, Pine and Sturges, met to review the BFC Transaction again. The Audit Committee analyzed the BFC Transaction to rectify a deficiency in Benihana's process under NASDAQ's standards.[116] As permitted by the applicable rules, Dornbush and Kevin Aoki participated in the discussion, although they were not members of the Committee. At the October 27 meeting, counsel to Benihana reviewed all of the allegations raised by BOT in the Amended Complaint in this action. The Audit Committee then deliberated and decided to ratify the BFC Transaction.

Later on October 27, 2004, the full Benihana Board met. After counsel to Benihana again reviewed the allegations raised in the Amended Complaint, the Board voted to ratify the BFC Transaction.

### II. ANALYSIS

BOT challenges the BFC Transaction on several grounds. First, BOT contends that the transaction is void because it violated 8 *Del. C.* § 151 and the applicable provisions of Benihana's Certificate of Incorporation.

BOT also claims that the BFC Transaction is invalid because the Board adopted it for an improper primary purpose of diluting BOT's interest in Benihana and entrenching certain Director Defendants and that the Director Defendants breached their fiduciary duties of loyalty and care in approving the Transaction.

The issues raised by BOT's legal argument under 8 *Del. C.* § 151 are distinct from the entrenchment and breach of fiduciary duty claims. Therefore, the Court begins its analysis with the § 151 claim.

### A. The Validity of the BFC Transaction Under 8 *Del. C.* § 151(a)

■ Benihana's Certificate of Incorporation states that: "No stockholder shall

---

113. The Court granted in part the request for expedited proceedings.

114. *Benihana of Tokyo,* 2005 WL 583828.

115. The parties agree that BOT's claims I through III are direct. *Id.* at *9. *See supra* n. 3.

116. The NASDAQ Stock Market on which Benihana is listed had advised the Company that NASDAQ's rules required that the BFC Transaction be approved by the Audit Committee or other independent body of the Board. *See* JX 131.

have any preemptive right to subscribe to or purchase any issue of stock or other securities of the Corporation or any treasury stock or other security." [117] In connection with the sale of preferred stock to BFC, Benihana granted BFC preemptive rights to purchase Benihana stock.[118] In particular, the Stock Purchase Agreement provides that Benihana shall not issue, sell or transfer any of its equity securities unless the Company provides BFC at least 30 days prior written notice specifying the price and other material terms of the issuance. During a defined period thereafter, BFC has the right to purchase at the same price up to the number of offered shares necessary for BFC to maintain the percentage ownership in the Company it had immediately before such issuance based on its purchase of preferred shares.[119]

BOT argues the BFC Transaction is invalid based on 8 *Del. C.* § 151(a) and the absence of any authorization in Benihana's Certificate of Incorporation for the Board to issue stock with preemptive rights. In response, Benihana argues that the Court should interpret the language in its Certificate of Incorporation as not prohibiting Benihana from granting preemptive rights by contract because the language of 8 *Del. C.* § 102(b)(3), which Benihana contends the language quoted above from its Certificate of Incorporation mirrors, has been interpreted to "not necessarily prohibit contractual preemptive right[s]." [120]

Thus, this Court must address whether the Benihana Board had the authority to grant preemptive rights to BFC in connection with its purchase of preferred stock consistent with the Delaware General Corporation Law ("DGCL") and its charter. In particular, the Court must consider the interplay of certain provisions of the DGCL with Benihana's Certificate of Incorporation and the Board's action in issuing the preferred stock.

Section 151 of the DGCL allows corporations to issue one or more classes of stock or one or more series of stock within a class, including stock with redemption rights, conversion features and other special rights.[121] The powers, preferences, rights and other characteristics of such shares, however, "shall be stated and expressed in the Certificate of Incorporation or of any amendment thereto, or in the resolution or resolutions providing for the issue of such stock adopted by the board of directors pursuant to authority expressly vested in it by the provisions of its certificate of incorporation." [122] In addition, 8 *Del. C.* § 151(g) provides:

> When any corporation desires to issue any shares of stock of any class or of any series of any class of which the powers, designations, preferences and relative, participating, optional or other rights, if any, or the qualifications, limitations or restrictions thereof, if any, shall not have been set forth in the

---

**117.** Pl.'s Opening Pretrial Br. Ex. 19, Art. Fourth.

**118.** SPA, Art. 4(k)(ii). The Certificate of Designations for the convertible preferred stock incorporated the terms of the SPA by reference. Certificate of Designations, Sec. 2.

**119.** SPA, Art. 4(k)(i), (ii).

**120.** Defs.' Post–Trial Ans. Br. at 45 (quoting Frank Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations & Business Organizations*, § 5.16 (2004)) (discussing *Garza v.*

*TV Answer, Inc.,* 1993 WL 77186 (Del.Ch. Mar.15, 1993)).

**121.** *See* 8 *Del. C.* §§ 151(a), (b) and (e). The DGCL is a part of the certificate of incorporation of every Delaware corporation. *See* 8 *Del. C.* § 394.

**122.** 8 *Del. C.* § 151(a). *See also Staar Surgical Co. v. Waggoner,* 588 A.2d 1130, 1135 (Del.1991).

certificate of incorporation or in any amendment thereto but shall be provided for in a resolution or resolutions adopted by the board of directors *pursuant to authority expressly vested in it by the certificate of incorporation or any amendment thereto,* a certificate of designations setting forth a copy of such resolution or resolutions and the number of shares of stock of such class or series as to which the resolution or resolutions apply shall be executed, acknowledged, filed, recorded and shall become effective, in accordance with § 103 of this title.[123]

Therefore, the Court also must consider the terms of Benihana's charter.

The relevant section of Benihana's Certificate of Incorporation is Article 4(b). This Article vests the Board with authority to "issue from time to time the Preferred stock of any series and to state in the resolution or resolutions providing for the issuance of shares of any series the voting powers, if any, designations, preferences and relative, participating, optional or other special rights"—i.e., a blank check authorization.[124] The BFC Transaction gives BFC the preemptive right to purchase additional equity securities of Benihana if the Company issues or transfers any of its equity securities and to do so at the same price and terms being offered to others.[125]

■ "Corporate charters and by-laws are contracts among the shareholders of a corporation and the general rules of contract interpretation are held to apply."[126] Accordingly, certificates of incorporation are "interpreted using standard rules of contract interpretation which require a court to determine from the language of the contract the intent of the parties.... If no ambiguity is present, the court must give effect to the clear language of the Certificate."[127]

■ Benihana disputes BOT's contention that the BFC Transaction is invalid. Benihana contends that the language in its Certificate of Incorporation regarding preemptive rights should not be interpreted as prohibiting Benihana from granting preemptive rights by contract when issuing preferred stock. They base this argument on the ambiguity they claim surrounds the intended purpose of the language in 8 *Del. C.* § 102(b)(3) and the parallel language in the Certificate of Incorporation. In that regard, Benihana relies on the 1967 and 1969 amendments to § 102. Before the 1967 amendments, § 102(b)(3) provided that a certificate of incorporation may contain provisions "limiting or denying to the stockholders the preemptive rights to subscribe to any or all additional issues of stock of the corporation."[128] As a result, a common law rule developed that shareholders possess

---

**123.** 8 *Del. C.* § 151(g) (emphasis added).

**124.** Pl.'s Opening Pretrial Br. Ex. 19, Art. 4(b).

**125.** *See* Stock Purchase Agreement ¶ 4(k).

**126.** *Centaur Partners, IV v. Nat'l Intergroup, Inc.,* 582 A.2d 923, 928 (Del.1990) (citing *Berlin v. Emerald Partners,* 552 A.2d at 488, *Hibbert v. Hollywood Park, Inc.,* 457 A.2d at 342–43, and *Ellingwood v. Wolf's Head Oil Ref. Co.,* 38 A.2d 743, 747 (Del.1944)). *See also Staar,* 588 A.2d at 1136 (stating that "a corporate charter is both a contract between the State and the corporation, and the corporation and its shareholders" and that "[t]he charter is also a contract among the shareholders themselves"); *Waggoner v. Laster,* 581 A.2d 1127, 1134 (Del.1990).

**127.** *Smith v. Nu–W. Indus., Inc.,* 2000 WL 1641248, at *3–4 (Del.Ch. Oct. 25, 2000).

**128.** David A. Drexler, Lewis S. Black, Jr. & A. Gilchrist Sparks, III, *Delaware Corporate Law and Practice,* § 6.02[3] (2002).

preemptive rights unless the certificate of incorporation provides otherwise. In 1967, the Delaware Legislature reversed this presumption. Section 102(b)(3) was amended to provide in pertinent part: "No stockholder shall have any preemptive right to subscribe to an additional issue of stock or to any security convertible into such stock unless, and except to the extent that, such right is expressly granted to him in the certificate of incorporation." [129]

Thereafter, companies began including boilerplate language in their charters to clarify that no shareholder possessed preemptive rights under common law.[130] Consistent with that practice Benihana's Certificate of Incorporation states that "[n]o stockholder shall have any preemptive right to subscribe to or purchase any issue of stock or other securities of the Corporation, or any treasury stock or other treasury securities." [131] I conclude that this type of boilerplate language concerning preemptive rights applies only to common law preemptive rights and not to contractually granted preemptive rights.[132]

Such a conclusion is reinforced by the fundamental principle that parties should have the freedom to contract and that their contracts should not easily be invalidated.[133]

The blank check provision in Benihana's Certificate of Incorporation suggests that the certificate was never intended to limit Benihana's ability to issue preemptive rights by contract to purchasers of preferred stock. Therefore, I do not read Article 4 of the charter as doing anything more than confirming that the common law presumption does not apply and that the Certificate of Incorporation itself does not grant any preemptive rights. The broad authorization to the Board to issue preferred stock and the Board's approval of the BFC Transaction and subsequent filing of an appropriate Certificate of Designations presents a different situation. Hence, I conclude that the Board did have the authority to issue the preferred stock with preemptive rights that is the subject of the BFC Transaction under Benihana's Certificate of Incorporation and the applicable provisions of the DGCL.[134]

---

**129.** 8 *Del. C.* § 102(b)(3).

**130.** *See* Balotti at Form 1.12 ("The holders of the Common Stock shall have no preemptive rights to subscribe for any shares of any class of stock of the Corporation whether now or hereafter authorized.").

**131.** JX 95, Art. 4.

**132.** *See* Andrew Nichols, *Shareholder Preemptive Rights*, 39–DEC BBJ 4, 24 (1995) ("[A] preemptive right may be viewed as a term of art which refers only to a right granted to all the shareholders, but does not include contractual rights granted to a subset of the shareholders who negotiate with the issuer for their individual right to acquire additional shares in defined circumstances. Second, the intent of the legislature in adopting provisions limiting or reversing the common law rule creating preemptive rights may have been only to reach the imposition of such rights as

a matter of common law, but not to preclude individually negotiated contractual rights.").

**133.** *Id.* at 27.

**134.** In that regard, I note that the preemptive rights apply only to the Preferred Stock and the owner of the Preferred Stock. If, for example, BFC converted certain of the Preferred Stock and sold one half of the resulting common shares, there would be no preemptive rights with respect to those shares. BFC would continue to have preemptive rights, however, in the converted shares and the preferred shares it still retained. Additionally, the preemptive rights provided for in the SPA (¶ 4(k)) do not apply to any stock issuance after the Termination Date, defined as "the date on which the Purchaser ("BFC") and its Affiliates cease to own at least 25% of the total number of Preferred Shares [under the SPA] outstanding." SPA, ¶ 4(k)(ii).

## B. The Applicable Standard of Review for the BFC Transaction

■ Before addressing the alleged breaches of fiduciary duties, the Court must determine whether it should judge the BFC Transaction under an entire fairness standard or the business judgment rule. There is no dispute that the BFC Transaction is an interested transaction; at a minimum, Abdo, a director of Benihana, had an interest in it as a director of BFC. Benihana argues, however, that the BFC Transaction qualifies for one of the "safe harbor" provisions of 8 *Del. C.* § 144(a) because a majority of informed and disinterested directors of the Board voted in favor of the Transaction. Defendants have the burden to demonstrate that one of the safe harbors of § 144 applies.[135] If this Court determines that Defendants have not satisfied § 144, entire fairness review applies.[136] If the Court determines that Defendants have satisfied § 144, then the transaction is protected against being invalidated solely because it is an interested one and the burden shifts to BOT to demonstrate that the transaction was unfair.[137] Further, if the requirements of § 144(a)(1) have been met, Abdo's "interest" in the Transaction would not vitiate the presumptions of the business judgment rule.[138]

## 1. The Applicability of Section 144(a)(1)

Under 8 *Del. C.* § 144(a)(1):

No contract or transaction between ... a corporation and any other corporation, partnership, association, or other organization in which 1 or more of its directors or officers, are directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the board or committee which authorizes the contract or transaction, or solely because any such director's or officer's votes are counted for such purpose, if: (1) The material facts as to the director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors or the committee, and the board or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum.

As discussed below, six of the nine Benihana directors, Pine, Sturges, Sano, Becker, Schwartz and Yoshimoto, voted to ratify the BFC Transaction (the "Voting Directors"). Abdo excused himself from the meeting during both the discussion and

135. *Cooke v. Oolie,* 2000 WL 710199, at *13 n. 41 (Del.Ch. May 24, 2000).

136. *HMG/Courtland Props., Inc. v. Gray,* 749 A.2d 94, 114 (Del.Ch.1999).

137. *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156, 1169–71 (Del.1995); *In re Cox Commc'ns, Inc. S'holder Litig.,* 879 A.2d 604, 614–15 (Del.Ch.2005).

138. When a court reviews a board's decision that is challenged as a breach of duty, "it should decline to evaluate the wisdom and merits of a business decision unless sufficient facts are alleged with particularity, or the

record otherwise demonstrates, that the decision was not the product of an informed, disinterested, and independent board." *Mills Acquisition Co. v. Macmillan, Inc.,* 559 A.2d 1261, 1279 (Del.1988); *see also Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984); *Pogostin v. Rice,* 480 A.2d 619, 624 (Del.1984); *Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del.1985). It is only after the presumption of the business judgment rule is rebutted that the burden shifts and the fiduciary must "demonstrate that the transaction complained of was entirely fair to the stockholders." *Williams v. Geier,* 671 A.2d 1368, 1378 (Del.1996).

vote on the Transaction, while Dornbush and Kevin Aoki abstained from the vote only. BOT contends that § 144(a)(1) does not apply here, because the Voting Directors were neither informed of the material facts regarding Abdo's interest in the BFC Transaction nor disinterested.

To determine whether the prerequisites of § 144(a)(1) are met, the Court must examine the interestedness of each of the Voting Directors, as well as the information available to them. Even if the requirements of § 144(a)(1) were not met, Defendants still could avoid having the interested BFC Transaction rendered void or voidable by proving that it was "fair as to the corporation" under § 144(a)(3). Defendants, however, seek to invoke not only the benefits of the safe harbor of § 144(a)(1), but also the presumptions of the business judgment rule.

■ In general, the business judgment rule is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[139] In *Brehm v. Eisner*, the Delaware Supreme Court identified several circumstances in which the business judgment rule would not apply.

> Thus, directors' decisions will be respected by courts unless the directors are interested or lack independence rel-

ative to the decision, do not act in good faith, act in a manner that cannot be attributed to a rational business purpose or reach their decision by a grossly negligent process that includes the failure to consider all material facts reasonably available.[140]

With that in mind, this Court ultimately must determine the applicability of both § 144(a)(1), which speaks in terms of "disinterested directors," and the business judgment rule, which depends on the disinterestness and independence of the directors.

■ To avoid unnecessary duplication in reviewing the circumstances of the individual directors, the analysis that follows addresses the allegations of interest and lack of independence as to each Voting Director. Regarding independence, the party alleging domination and control of a company's board of directors bears the burden of proving such control by showing a lack of independence on the part of the directors.[141] In assessing director independence, the court must apply a subjective "actual person" standard, instead of an objective "reasonable director" standard.[142] An independent director is one whose decision "is based on the corporate merits of the subject before the board rather than extraneous considerations or influence,"[143] while a director who is not independent is "dominated or otherwise

---

**139.** *Aronson,* 473 A.2d at 812.

**140.** 746 A.2d 244, 264 n. 66 (Del.2000). *See also In re Walt Disney Co. Deriv. Litig.,* 2005 WL 2056651, at *36 n. 464 (Del.Ch. Aug. 9, 2005). The Delaware Supreme Court defines "disinterested directors as those directors that neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." *Williams,* 671 A.2d at 1377 n. 19 (internal citations omitted). Likewise, "independent

means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Id.* (internal citations omitted).

**141.** *Odyssey Partners, L.P. v. Fleming Companies, Inc.,* 735 A.2d 386, 407 (Del.Ch.1999).

**142.** *Orman v. Cullman,* 794 A.2d 5, 24 (Del. Ch.2002).

**143.** *Aronson,* 473 A.2d at 816.

controlled by an individual or entity interested in the transaction."[144] Control over individual directors is established by facts demonstrating that "through personal or other relationships the directors are beholden to the controlling person"[145] or so under "their influence that their discretion would be sterilized."[146]

BOT advances several grounds for its argument that the directors were interested in or lacked independence with respect to the BFC transaction. I address those grounds below.

### 2. Were the Voting Directors disinterested and independent?

#### a. Pine, Sano and Sturges

■ Plaintiff argues that Pine, Sano and Sturges were interested because the BFC Transaction removed a threat to their incumbency.[147] Defendants respond by arguing that even after the BFC Transaction BOT had sufficient voting power to remove directors. In particular, a successful proxy fight by BOT caused Sano to lose his Board seat in the 2004 election. Further, Defendants contend that neither Pine nor Sturges "needs" or "depends on" his Benihana directorship.[148]

■ Entrenchment, self-dealing, or financial interest can indicate that a director is interested or lacks independence.[149] There is no evidence that Pine, Sano or Sturges has any financial interest in the BFC Transaction, only BOT's allegations of an entrenchment motive. BOT, however, must prove that the directors believed they were vulnerable to being removed from office, and that they took entrenchment action.[150] "In most circumstances Delaware law routinely rejects the notion that a director's interest in maintaining his office, by itself, is a debilitating factor."[151] Further, the fact that directors receive fees for their services does not establish an entrenchment motive on their part.[152]

Plaintiff has failed to prove that Pine, Sano or Sturges depends financially on his Benihana directorship. Pine is a lifelong restaurant executive and the former CEO of Restaurant Associates, Inc. Sturges is a lawyer, entrepreneur and gaming industry executive. Apart from a conclusory allegation about threats to their incumbency, BOT offered no evidence of specific facts relating to the financial or other benefits these individuals received for being Benihana Directors. Thus, I find that BOT has failed to show that Pine, Sano or Sturges were either interested in the BFC

---

144. *In re MAXXAM, Inc.,* 659 A.2d 760, 773 (Del.Ch.1995).

145. *Aronson,* 473 A.2d at 815.

146. *Rales v. Blasband,* 634 A.2d 927, 936 (Del.1993).

147. In their brief BOT makes similar assertions for the other directors, but they do not provide any further detail regarding how the BFC Transaction removes a threat to their incumbency in the context of their "director independence" or interest arguments. Instead, BOT discussed its incumbency arguments in the sections of its briefs challenging the propriety of the directors' purpose. Ac-

cordingly I treat that aspect of BOT's argument in the "improper purpose" section of this opinion.

148. Defs.' Post-trial Ans. Br. at 13.

149. *Grobow v. Perot,* 539 A.2d 180, 188 (Del. 1988).

150. *Grobow v. Perot,* 526 A.2d 914, 923 (Del. Ch.1987).

151. *Solomon v. Armstrong,* 747 A.2d 1098, 1126–27 (Del.Ch.1999).

152. *Kahn v. MSB Bancorp, Inc.,* 1998 WL 409355, at *3 (Del.Ch. July 16, 1998).

Transaction or lacked independence from anyone else who was.

### b. Schwartz and Yoshimoto

BOT argues that Schwartz and Yoshimoto, as directors and officers of Benihana, were interested in the BFC transaction because it removed a threat to their incumbency. As discussed later in connection with Plaintiff's contention that the directors acted for an improper entrenchment purpose, I find that BOT has not proven that allegation. Thus, for the reasons explained *infra*, Plaintiff's allegations of entrenchment do not provide an adequate basis for concluding that either Schwartz or Yoshimoto was interested in the BFC Transaction.

Plaintiff also contends that Schwartz and Yoshimoto lacked independence because they were dependent on Abdo for their compensation. Particularly, Abdo served as chairman of both Benihana's compensation committee and nominating committee and as a member of the executive committee.[153] Defendants deny that Schwartz and Yoshimoto were beholden to Abdo, contending that Abdo lacked unilateral power to affect their positions. Defendants also argue that the cases cited by BOT do not apply because they relate to Rule 23.1 and not 8 *Del C.* § 144(a)(1).[154]

In *Rales*, the court analyzed the independence issue on a motion to dismiss.[155] In that case the interested directors were brothers who held a 44% controlling interest in the company.[156] One employee director received approximately $1 million per year from the company and the other received $300,000 per year from another company in which the brothers served as vice presidents and owned a majority of the stock.[157] The court found that the interested directors' position as chairman of the company's executive committee placed them in a position to exert considerable influence over the other directors who were employees of the company. Therefore, the court concluded that reasonable doubt existed as to whether the employee directors could consider impartially an action that was contrary to the interest of the interested directors. The situation here is quite different.

Unlike *Rales*, this case involves a post-trial assessment of independence. The Court has the benefit of a full record, including the opportunity to consider Schwartz's trial testimony and review Yoshimoto's deposition. In addition, both Schwartz and Yoshimoto had multi-year employment contracts that established their base salaries and prohibited their termination except for cause.[158] Further-

---

153. Schwartz Dep. at 89; Abdo Dep. at 14.

154. Defendants' attempt to distinguish the cases cited by BOT because they deal with independence in the context of demand excusal lacks merit. In *Aronson*, which defined the test for demand excusal under Chancery Court Rule 23.1, the court cited 8 *Del C.* § 144(a)(1) as the proper standard for determining director independence under Rule 23.1. 473 A.2d 805. Moreover, Defendants have not cited any case that supports their position that the test for independence under § 144(a)(1) differs from that under Rule 23.1.

155. 634 A.2d 927.

156. *Id.* at 930.

157. *Id.* at 937.

158. *See* Benihana, Inc. Form 10–K/A, filed Sept. 4, 2001 for fiscal year ending Apr. 1, 2001, at Ex. 10.07, § 8 (Schwartz) and Ex. 10.12, § 8 (Yoshimoto), http://www.sec.gov/Archives/edgar/data/9 35226/000093522601500010/form10–k2001.tx t. According to Benihana's 10K for the fiscal year ended March 28, 2004, Schwartz's salary ranged from $317,308 to $339,195 and his bonuses from $57,334 to $114,000 between 2002 and 2004. During the same period, Yoshimoto's salary increased from $174,519 to $186,135 and his bonuses ranged from $61,000 to $39,334. JX 97 at BNH000561.

more, Abdo did not have unilateral power to determine the employee directors' bonuses and other compensation. Instead, he chaired a three member committee charged with that responsibility.

This Court will not find a director beholden unless the purported controlling person has "unilateral" power to substantially affect the director.[159] Plaintiffs concede that there is no evidence that Abdo ever threatened to use his power as chairman of the committee to affect the officers' compensation adversely.[160] Thus, based on the evidence presented at trial I find that Schwartz and Yoshimoto were independent.

Even if I concluded that Schwartz and Yoshimoto were "interested" based on concerns about incumbency (which I have not) or lacked independence, their conflicts would not vitiate the approval of the BFC Transaction by the disinterested and independent majority.[161] Because a majority of the disinterested and independent directors approved the BFC Transaction, the interested nature of that transaction does not render it either void or voidable solely for that reason, provided the material facts as to Abdo's and any other director's or officer's interest were disclosed or known to the Benihana Board.[162]

### c. Becker

BOT contends that Becker was not independent because he and Abdo serve as outside directors of Bluegreen Corporation, a subsidiary of BFC.[163] BOT further emphasizes that Abdo invited Becker to join the Bluegreen board,[164] for which Becker receives $44,000 per year as compensation.[165]

Defendants argue that none of these facts is out of the ordinary or demonstrates that Becker's directorship at Bluegreen was of such importance to him, financially or otherwise, that it clouded his judgment with respect to the BFC Transaction.[166] Defendants further contend that the cases cited by BOT are not apposite, because they are pretrial decisions, and therefore do not support a conclusion that BOT met its burden at trial in challenging Becker's independence from Abdo.[167]

I agree. Becker's appointment to the Bluegreen board did not involve extraordinary circumstances; people normally get appointed to boards through personal contacts. Further, BOT has not proven that Becker's Bluegreen appointment combined with his modest compensation clouded his judgment with respect to the BFC Transaction.

This Court has held that a finding for purposes of a motion to dismiss that reasonable doubt exists as to a director's independence or disinterest has "very limited significance."[168] Such a determination

**159.** *Telxon Corp. v. Meyerson,* 802 A.2d 257, 264 (Del.2002).

**160.** Pl.'s Post-trial Reply Br. at 13 n. 16; *see In re Delta and Pine Land Co. S'holders Litig.,* 2000 WL 875421, at *8 (Del.Ch. June 21, 2000) (dismissing claim because complaint lacked allegations that chairman of compensation committee exercised financial influence or control over employee directors).

**161.** *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156, 1168 (Del.1995).

**162.** 8 *Del. C.* § 144(a)(1).

**163.** Pl.'s Opening Post-trial Br. at 33.

**164.** Becker Dep. at 11.

**165.** *Id.* at 9, 11–14.

**166.** Defs.' Post-trial Ans. Br. at 15.

**167.** *Id.* at 14–15.

**168.** *Siegman v. Tri–Star Pictures, Inc.,* 1989 WL 48746, at *12 (Del.Ch. May 5, 1989).

only enables a plaintiff to proceed to discovery and potentially to trial, where the plaintiff must prove by a preponderance of the evidence that the director in fact lacked independence or was interested.[169] Thus, I do not find persuasive the pre-trial decisions cited by BOT.

Turning to the post-trial decisions cited, BOT asserts that the reasoning in *Kahn v. Tremont Corp.* controls this decision.[170] According to BOT, Becker, like the directors in *Kahn*, lacks independence because he "had previous affiliations with [Abdo, the interested party] or companies that he controlled and, as a result received significant financial compensation or influential positions on the boards" of companies Abdo controlled.[171]

Plaintiff's reliance on *Kahn* is misplaced. First, the board member in *Kahn* received more than ten times the compensation Becker receives for his position on the Bluegreen board.[172] Second, unlike this case, three of the directors in *Kahn* failed to attend the informational meetings concerning the transaction; yet, they promptly ratified suggestions of the director to whom the court held they were behol-

den.[173] Consequently, the factual showing in *Kahn* was much stronger than the evidence BOT presented here. Thus, the holding in *Kahn* does not support a post-trial finding that Becker was not independent or that he was interested in the BFC Transaction.

The facts in *In re MAXXAM, Inc.*, another post-trial decision cited by Plaintiff, also are far more egregious than this case.[174] In *In re MAXXAM*, the court identified three board members who lacked independence. The financial compensation those directors received greatly exceeded Becker's compensation as a Bluegreen director.[175] Becker's relatively small compensation of $44,000 did not make him beholden to Abdo. Thus, Plaintiff failed to meet their burden at trial in demonstrating that Becker's position on the Bluegreen board made him beholden to Abdo.

■ Next BOT asserts that Becker lacked independence from Schwartz because he had been Schwartz's close friend for 40–45 years and the two met every ten

169. *Aronson*, 473 A.2d at 812.

170. Pl.'s Post-trial Reply Br. at 13 (citing *Kahn v. Tremont Corp.*, 694 A.2d 422 (Del. 1997)).

171. *Id.* (citing *Kahn*, 694 A.2d at 429–30).

172. Becker received $44,000 per year for serving on the Bluegreen board whereas the director in *Kahn* received $10,000 a month as a consultant to the company and over $325,000 in bonuses. *Kahn*, 694 A.2d at 429–30.

173. *Id.*

174. 659 A.2d at 774.

175. *Id.* The court discussed the three board members' financial dependence as follows: "(1) In 1988 a MAXXAM subsidiary retained

former Governor John Connally (who had recently emerged from personal bankruptcy and was not financially independent) as a consultant. Under the terms of his consulting contract, Governor Connally was paid $250,000 per year, and the contract was renewed annually until Governor Connally's death in 1993.(2) John Seidl had been Chairman and CEO of another controlled entity, since 1989. In that capacity, Mr. Seidl received an annual salary of $450,000, and in the year of the Mirada transaction, he received additional compensation of over $4.8 million through a Kaiser incentive plan. (3) William Leone was President of MAXXAM from 1980 to 1990. In his last year as MAXXAM's President, Leone received over $900,000 in compensation from that company. After the end of his term he entered into a one year $250,000 consulting contract with a MAXXAM subsidiary. That contract was operative at the time of the transaction." *Id.*

to fourteen days.[176] This relationship does not destroy Becker's independence, however. "[A]llegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence."[177] In this case, the evidence only shows that Becker had a longstanding friendship with Schwartz. This alone does not render Becker interested in the BFC Transaction or prove he lacked independence, especially where, as discussed elsewhere in this opinion, Schwartz was not interested in the Transaction and did not lack independence.

Plaintiff further contends that Becker's hostility toward BOT precluded him from acting independently. Specifically, BOT relies on Becker's deposition testimony that he wasn't comfortable with BOT running a major part of the Company. Defendants accuse Plaintiff of mischaracterizing Becker's deposition. They contend that the deposition refers to concerns about Rocky Aoki's influence over the Company, not BOT's.

Specifically, Becker had indicated that he didn't know if he would have been in favor of an alternative that involved selling $10,000,000 of the preferred stock to each of BFC and BOT. When asked why at his deposition, Becker explained:

> Well, because of all the things that have happened with the trust, Benihana and Rocky being a convicted felon, I am not sure I would feel comfortable for the other shareholders of the company if we had a felon—not controlling but having

severe influence over such a significant part of the company.[178]

Rather than demonstrating that Becker was "hostile to BOT," as Plaintiff claims, this testimony suggests that he simply was wary of Rocky Aoki's involvement in Benihana. Moreover, even if Becker were hostile to BOT, that fact alone would not be sufficient, in my opinion, to demonstrate that Becker either was an interested director or lacked independence from Schwartz and Abdo for purposes of the BFC Transaction.

### 3. Material facts disclosed or known

■ BOT argues that the Voting Directors were uninformed because they were not aware: (a) that Abdo himself negotiated on behalf of BFC, (b) that significant changes to the term sheet were made as a consequence of the negotiations with BFC, or (c) of the correct net debt figures. According to BOT, the actions of Schwartz, Dornbush and Abdo constitute undisclosed self-dealing, deception and manipulation of the Board which require application of the entire fairness standard.

■ To be informed a board does not need to know every fact. Rather, the board is responsible for considering material facts that are reasonably available, not those that are immaterial or out of the board's reasonable reach.[179] The term "material" in this context means "relevant and of a magnitude to be important to directors in carrying out their fiduciary duty of care in decisionmaking."[180]

---

176. Pl.'s Opening Post-trial Br. at 33.

177. *Beam v. Stewart*, 845 A.2d 1040, 1051–52 (Del.2004); *In re Western Nat'l Corp. S'holders Litig.*, 2000 WL 710192, at *12 (Del.Ch. May 22, 2000) (rejecting inference that longtime friendships prevented the director from being independent).

178. Becker Dep. at 127–28.

179. *Brehm v. Eisner*, 746 A.2d 244, 259 (Del. 2000).

180. *Id.* at 260 n. 49 (internal quotations omitted). In the different context of a disclosure to stockholders, "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Id.* (internal quotations omitted).

### a. Abdo's negotiation of the Transaction on behalf of BFC

BOT argues that Abdo concealed his interest in the BFC Transaction too long.[181] Specifically, they assert that Schwartz, Dornbush and Abdo were required to disclose Abdo's interests in the BFC Transaction before the January 29 and February 17 Board meetings.[182] Plaintiff contends that Abdo had two different interests in the BFC Transaction that he failed to timely disclose to the Board: (1) that he previously discussed purchasing Benihana stock from the Aoki children; and (2) that he represented BFC in the negotiations. Defendants contend that Abdo fully and timely informed the Board about his interests in the BFC Transaction at the May 6 meeting.[183] They dismiss Abdo's discussions with the Aoki children as immaterial to the BFC Transaction and contend that the Board members knew that Abdo acted on behalf of BFC.

There are several problems with Plaintiff's argument that Abdo had a duty to disclose prior discussions with the Aoki children to the Benihana Board in connection with the January 29 and February 17 Board meetings. First, after hearing the testimony and considering the available evidence, I have found that Abdo did not approach Kevin Aoki at their September 2003 dinner meeting about the possibility of Abdo purchasing BOT's stock in Benihana.[184] Further, that allegation related only to Abdo's interest in the stock; there is no mention of a purchase on behalf of BFC. Second, there is no evidence of any other communication between Abdo and any of the Aoki children regarding a possible purchase of BOT shares until the March 2004 lunch meeting he had with Kevin. In addition, the evidence indicates that Abdo did not approach his partner at BFC, Levan, about having BFC purchase $20 million worth of Benihana convertible preferred stock until immediately after the February 17 Board meeting. Thus, I find that neither Abdo nor BFC had made a decision to attempt to purchase the convertible preferred shares at the time of the February 17 meeting. Therefore, Abdo did not breach any disclosure obligation to Benihana or his fellow directors in failing to disclose his or BFC's interest at the February 17 and earlier meetings.

The facts relating to Abdo's participation in the negotiations with Morgan Joseph are as follows. Two or three days after the February 17 meeting, and with Levan's approval, Abdo advised Joseph that BFC had an interest in purchasing the Benihana convertible preferred stock being offered to finance the Construction and Renovation Plan. Benihana welcomed Abdo's involvement. In early April 2004, Morgan Joseph sent its private placement memorandum to BFC and negotiations began between Joseph and Abdo. The negotiations continued through the end of April. By agreement, Benihana did not shop the issuance to anyone else during that period. Schwartz sent the negotiated term sheet to the Board on April 30, 2004, but did not indicate BFC was the purchaser. Schwartz informally identified BFC's role to Becker, Sturges, Sano and possibly Pine before the Board meeting on May 6, at which the directors reviewed the proposed transaction.

 As a member of the Benihana Board Abdo had an "unremitting obli-

---

181. Pl.'s Post-trial Rely Br. at 4.

182. *Id.* at 5.

183. Defs.' Post-trial Ans. Br. at 20.

184. *See supra,* B.

gation" to deal candidly with his fellow directors.[185] This obligation requires directors to take affirmative steps to disclose any interest they may have in a transaction.[186] Absent special circumstances in which the board would have reason to expect earlier disclosure, however, a director has no duty to disclose his interest in a transaction until he seeks board approval of the transaction.[187]

Here, the disinterested directors, at least, knew that Abdo acted on behalf of BFC before the May 6 meeting. Schwartz recalled having conversations with Becker, Sturges, Sano, and possibly Pine, before the May 6 meeting, informing them of Abdo's involvement.[188] Further, Abdo made a presentation to the Board on behalf of BFC at the May 6 meeting. Thus, the directors knew that Abdo represented BFC. Also, Morgan Joseph, not Abdo, negotiated the terms on behalf of Benihana.

BOT suggests that Abdo's participation in the negotiations was unfair, because he attended the meetings at which Benihana's Board determined the parameters of their proposed stock offering. Plaintiff also argues that by failing to disclose Abdo's involvement in the negotiations, Schwartz and others tainted the process. The Board, however, did not vote for the final terms of the transaction at the February 17 meeting; instead, they approved a course of action and considered the terms for the Preferred Stock offering discussed at that meeting more akin to a "wish list."[189] Nor did BOT prove at trial that Abdo knew at the February 17 meeting that BFC would offer to purchase the Preferred Stock. Further, the Board had adequate time to consider the transaction after they knew that Abdo acted on behalf of BFC. For example, after the May 6 meeting and before the BFC Transaction was consummated, the Board met on May 20 and again on June 11, and voted to proceed with the transaction after considering BOT's objections and the purported alternatives suggested by BOT's counsel.[190] Benihana also obtained a fairness opinion from Morgan Joseph before they consummated the BFC Transaction.

BOT also insinuates that BFC obtained better terms in the Transaction than it would have otherwise, because Abdo negotiated the deal after having attended the January and February Board meetings. The evidence does not support that conclusion. As Joseph explained at trial, the negotiations involved give and take on a number of points, but Benihana "ended up where we wanted to be" in what Joseph "considered material aspects, the amount, the two takedowns, the dividend and conversion premium."[191]

---

**185.** *HMG/Courtland Props.*, 749 A.2d at 119.

**186.** *Id.*

**187.** *Cf., e.g., Metro Commc'n Corp. BVI v. Advanced Mobilecomm Tech., Inc.*, 854 A.2d 121, 153 (Del.Ch.2004) (no fiduciary duty to make disclosures to stockholders except when requesting stockholder action); *Raskin v. Birmingham Steel Corp.*, 1990 WL 193326, at *5 (Del.Ch. Dec. 4, 1990) ("The state law duty of candor arises when the board elects to or has a duty to seek shareholder action. If the board does not seek shareholder action ... it has, in my opinion, no distinctive state law duty to disclose material developments with respect to the company's business.").

**188.** Schwartz Dep. at 89–90, 92, 93.

**189.** Schwartz Dep. at 274.

**190.** These ratifications, as well as the October 27, 2004 ratification after consideration of the allegations in BOT's Amended Complaint, provide additional, independent grounds to conclude that the informational component of 8 *Del. C.* § 144(a)(1) was satisfied.

**191.** Tr. at 655.

In addition, Abdo's interest in acquiring Benihana stock was not material to the BFC Transaction. None of the directors testified that they might have voted differently on the BFC Transaction had they known of Abdo's earlier indications of interest in buying Benihana stock. Abdo's potential purchase for a million dollars of an option to acquire Benihana stock from the Aoki children is not analogous to a significant investment of over $20 million by BFC. I therefore find unpersuasive BOT's argument that Abdo should have told the Board about his discussions with the Aoki children in September 2003. First, as previously found, the Aoki children initiated that contact with Abdo. Hence, Abdo was not actively seeking to purchase Benihana stock. Second, the Aoki children did not communicate with Abdo again until March 2004. Consequently, BOT failed to prove that Abdo's discussions with the Aoki children ever reached a point at which he would have been required to inform the Board about them.

### b. "no significant changes to the term sheet"

Plaintiff asserts that Joseph deceived the Board as to the nature and extent of the negotiated changes Morgan Joseph and BFC made to the term sheet.[192] They contend that Joseph misled the Board at the May 6 meeting when he told them that there had been "no significant changes in the term sheet."[193] Characterizing this statement as "an obvious deception," BOT contends the following material changes were made to the term sheet:

(1) While the term sheet proposed by Morgan Joseph provided for perpetual preferred stock and gave BFC no right to force a redemption, Abdo requested and Joseph agreed to give BFC the right to force Benihana to redeem the full $20 million at any time after ten years at BFC's option; (2) While the term sheet proposed by Morgan Joseph had given Benihana the option of not issuing the second $10 million tranche, Abdo requested and Joseph agreed to make that issuance mandatory; (3) While the term sheet proposed by Morgan Joseph did not provide the purchaser with pre-emptive rights to purchase a proportional amount of any new voting securities issued by Benihana, Abdo requested and Joseph agreed to give such rights to BFC; and (4) While the term sheet proposed by Morgan Joseph provided that the purchaser would have the right to appoint an additional director to the Benihana Board if Benihana missed 4 consecutive dividend payments, Abdo requested and Joseph agreed to give BFC the right to appoint the additional director if Benihana missed just 2 consecutive dividend payments.[194]

Defendants deny that Joseph's statement that there were "no significant changes" deceived the Board. They argue that Plaintiff has not produced any evidence that Joseph intended to deceive the Board or that the Board culpably ignored any material fact contained in the term sheet.[195]

The parties do not dispute that changes were made to the term sheet. In fact the Board expected that changes would be made to the January 29 term sheet.[196]

192. Pl's Opening Post-trial Br. at 5.

193. *Id.* at 5 (citing Tr. at 95–96 (Schwartz), 996–97 (Pine)).

194. *Id.* at 5–6 (internal record citations omitted).

195. Defs.' Post-trial Ans. Br. at 21–22.

196. Tr. at 918–19 (Sturges) ("Q. By the way, the sheet that was in the January 29 book, did you consider that to be a developed term sheet, or what was your view of that docu-

Thus, my analysis centers on whether the Board did not know about any significant changes.

The Board knew of several changes in the term sheet. For example, the January 29 term sheet called for an interest rate of 6% plus or minus 0.5%, but the May 6 term sheet provided for a rate outside that range, 5%. The Board discussed this change at the May meeting.[197] Moreover, the directors took home the May board book that contained the May 6 term sheet, and therefore had an opportunity to review the term sheet.

Benihana's negotiator, Joseph, believed that although changes had been made to the term sheet, Benihana ended up where it wanted to be. Joseph described the changes that evolved through negotiation as follows:

> We negotiated the approvals required for material corporate actions. I thought BFC was reasonable in their request. Those negotiations were not terribly intense. They made some suggestions. We asked to move a few of them around, and that was okay. On the board seats, we had some discussions and got it down to one. So I ended up quite satisfied that we had a transaction that, in what I considered

material aspects, the amount, the two takedowns, the dividend and conversion premium. This sort of hierarchy of importance and you can get hung up on all these points, but you got to remember what's most important. On the important points we ended up where we wanted to be.[198]

I find this testimony credible and that Joseph honestly believed that the changes to the term sheet were not significant. Hence, I find that Joseph did not mislead the Board.

### c. Correct net debt figures

Plaintiff contends that Joseph and Schwartz misled the Board at the February 17 Board meeting when they told them that Benihana expected to have $37.3 million of net debt at the close of their fiscal year, on March 30, 2004.[199] In particular, Plaintiff asserts that Schwartz and Joseph knew they had presented incorrect net debt figures to the Board.[200] According to Plaintiff, this deception caused the Board to decide not to rely solely upon the Wachovia Proposal to finance the renovation.[201] Defendants deny that Joseph and Schwartz intentionally deceived the Board at the February 17 meeting.[202] Further they contend that even though the projections ultimately proved to be incorrect, this

---

ment? A. There was, as I recall, a one-page outline in the January 29 book, which I considered to be a wish list, a financing that Morgan Joseph thought could be achieved. But I certainly expected, as had been my experience with investment bankers saying what the financing is going to look like, you know, and then the ultimate end product, there is very often, as a result of give and take and a negotiation, some changes. And Morgan Joseph went through kind of the evolution of the term sheet and where it now stood as a result of discussions with BFC.").

197. Tr. at 919–20 (Sturges).

198. Tr. at 655; *see also* Tr. at 648–55.

199. Pl.'s Opening Post-trial Br. at 7 (citing Tr. at 731 (Joseph), 67 (Schwartz)). At the close of the fiscal year Benihana actually reported net debt of $19.3 million. Joseph Dep. at 21.

200. Pl.'s Opening Post-trial Br. at 7 (relying on Schwartz's testimony that "there was not much likelihood that Benihana's net debt would go above $20 million by the end of the fiscal year" and that the board of directors "certainly knew that Benihana's net debt was not going to go above ... $28 million.")

201. *Id.*

202. Defs.' Post-trial Ans. Br. at 23.

misstatement was immaterial because the Board received correct and accurate information at the May 6, 2004 Board meeting.[203]

At trial Joseph and Schwartz explained why the actual net debt figures differed from the projections. The disparity resulted in part from unforeseen delays in certain projects, caused by issues related to zoning, building inspections, and review by architectural boards.[204] For example, the Philadelphia location was delayed due to problems complying with zoning ordinances.[205] I find that Joseph and Schwartz did not intentionally misstate the net debt figures.[206]

Additionally, although the Board had the wrong net debt figures at the February 17 meeting, they did not make any irreversible decision based on that information. In fact, the Board met again on May 6 to consider debt financing. At the meeting, Joseph, acting on behalf of Morgan Joseph,

> made the point, wanted to make the point that—some capital expenditures had been delayed so that the debt balance end of '04 was less than we projected earlier. And there was some discussion about this page [which reflects the updated cash flow projections based on the base case] at the—at the board meeting. And we pointed out that based on our conversation with manage-

ment, we believed that these were temporary deferrals as opposed to fundamental long-term changes in capital needs.

Q. And did those changes result in any changes in your conclusions?

A. No, they did not.[207]

Finally, the alleged misstatement in net debt figures was immaterial to the decision to use equity financing. The Defendant Directors testified that the decision to finance the renovations of the majority of the Benihana restaurants with equity rather than debt resulted from a desire to avoid the debt to EBITDA covenant that Wachovia required.[208] Benihana expected these renovation efforts to last at least five years.[209] Some Directors feared that this covenant might restrict Benihana's access to necessary funds, thereby hindering the renovation plan if Benihana had a bad year.[210] Moreover, while the Board may have considered the net debt figures important in determining what kind of financing alternatives to pursue, those figures comprised only a small part of the overall package of information presented to the directors. Based on all the evidence, I find that the alleged misstatement in the net debt figures was unintentional and immaterial in view of the later correction.

203. *Id.*

204. Tr. at 754 (Joseph), 588 (Burris).

205. Tr. at 588 (Burris).

206. *See, e.g.,* Tr. at 588 (Burris) ("[T]hose kind of things you can't predict with any degree of certainty whether the project is going to be completed or not. It's certainly prudent that it—to complete these projects, to estimate these projects to be completed for the purpose of maintaining our financial security.")

207. Tr. at 657; *see also* Tr. at 754 (Morgan Joseph learned about the change in net debt figures "during our due diligence in preparing the private placement memorandum and then pointed it out quite extensively at the May 6th board meeting.").

208. *See, e.g.,* Tr. at 910–12 (Sturges), 967–68 (Pine).

209. Tr. at 658 (Joseph).

210. Tr. at 910–12 (Sturges), 968–71 (Pine).

#### 4. Conclusion (applicability of § 144)

While I find that the Benihana Board's approval of the BFC Transaction meets the requirements of 8 *Del. C.* § 144(a)(1), that section merely protects against invalidation of a transaction "solely" because it is an interested one.[211] "Nothing in the statute sanctions unfairness to [the Company] or removes the transaction from judicial scrutiny."[212] Defendants assert that if they meet the requirements of § 144(a)(1), the transaction is beyond the reach of entire fairness. That is not necessarily correct.

■ Satisfying the requirements of § 144 only means that the BFC Transaction is not void or voidable *solely* because of the conflict of interest.

> While non-compliance with §§ 144(a)(1), (2)'s disclosure requirement by definition triggers fairness review rather than business judgment rule review, the satisfaction of §§ 144(a)(1) or (a)(2) alone does not always have the opposite effect of invoking business judgment rule review.... Rather, satisfaction of §§ 144(a)(1) or (a)(2) simply protects against invalidation of the transaction 'solely' because it is an interested one. As such, § 144 is best seen as establishing a floor for board conduct but not a ceiling.[213]

Thus, equitable common law rules requiring the application of the entire fairness standard on grounds other than a director's interest still apply.[214]

Because BOT also contends that the Director Defendants breached their fiduciary duties of loyalty and care, my analysis does not end with the "safe harbor" provisions of § 144(a).

#### C. Improper Primary Purpose

■ Plaintiff contends that the Board approved the BFC Transaction for the improper purpose of entrenching the Board members in office.[215] Defendants argue that BOT has not met their burden on this issue because: (1) BOT has not shown that any of the directors subjectively had entrenchment as the sole or primary purpose of their actions; (2) the BFC Transaction had a *de minimis* entrenchment effect, if any, given Benihana's preexisting corporate governance structure; and (3) a majority of the directors voting on the BFC Transaction did not have an entrenchment purpose and their assent to the transaction was not the result of fraud or manipulation by their fellow-directors.[216]

■ Corporate fiduciaries may not utilize corporate machinery for the purpose of perpetuating themselves in of-

---

211. *HMG/Courtland Props.*, 749 A.2d at 114 n. 24.

212. *Fliegler v. Lawrence*, 361 A.2d 218, 222 (Del.1976).

213. *HMG/Courtland Props.*, 749 A.2d at 114 n. 24 (internal citations omitted).

214. "[Section] 144 has been interpreted as dealing solely with the problem of per se invalidity.... The somewhat different question of when an interested transaction might give rise to a claim for breach of fiduciary duty—i.e., to a claim in equity—as left to the common law of corporations to answer. Mere compliance with 144 did not necessarily

suffice." *In re Cox Commc'ns*, 879 A.2d at 614–15.

215. Pl.'s Opening Post-trial Br. at 26. Plaintiff further contends that a by-product of the BFC Transaction is the dilution of BOT's controlling interest from just over 50 percent to approximately 36 percent. *Id.* at 1. To the extent that some or all of the Defendant Directors had a primary purpose to dilute BOT's stock ownership, that also could constitute an improper purpose. *Flight Options Int'l, Inc. v. Flight Options, LLC*, 2005 WL 2335353 (Del.Ch. July 11, 2005).

216. Defs.' Post-trial Ans. Br. at 27.

fice.[217] A plaintiff charging a primary purpose of entrenchment bears a heavy burden of proof at trial.[218]

A successful claim of entrenchment requires plaintiffs to prove that the defendant directors engaged in action which had the effect of protecting their tenure and that the action was motivated *primarily or solely* for the purpose of achieving that effect.[219]

Where a board's actions are shown to have been taken for the purpose of entrenchment, they may not be permitted to stand.[220]

▆ The fact that a plan has an entrenchment effect, however, does not mean that the board's primary or sole purpose was entrenchment.[221] Conversely, where the objective sought in the issuance of stock is not merely the pursuit of a business purpose but also to retain control, a court will not accept the argument that the control effect of an agreement is merely incidental to its primary business objective.[222]

Plaintiff asserts that Dornbush and Schwartz pursued the BFC Transaction in order to entrench themselves in office. BOT further asserts that Dornbush and Schwartz subsequently misled the Board when they convinced them that debt financing did not represent the best mechanism to fund the renovation project. Addi-

tionally, Plaintiff contends that Dornbush and Schwartz felt threatened by Keiko Aoki because Dornbush testified that "if Keiko gained control," Schwartz would have to "weather the storm" because she "presumably would be hostile to management."[223] Dornbush further testified that he "shared" a "concern" that, upon obtaining control of Benihana, Keiko Aoki, would "remove all of the people who were there for 20 years of service."[224] BOT also contends that, after the BFC Transaction, Schwartz persuaded Sano to switch directorships with him precisely "so that [he][was]n't at risk of being removed from the board of directors of Benihana if BOT could, together with other stockholders, win the election" at the 2004 annual meeting.[225]

▆ Although, as Plaintiff points out, Keiko may be "hostile to management," it still would take her several years to exert meaningful control over Benihana. Further, although Keiko's potential hostility may have given the directors a reason to entrench themselves that does not mean *ipso facto* that the directors approved the BFC transaction primarily or solely for that purpose. The law requires more than just a motivation to entrench.[226]

Dornbush was a named partner of a law firm that is "general counsel to Beniha-

**217.** *Schnell v. Chris–Craft Indus., Inc.,* 285 A.2d 437, 439–40 (Del.1971).

**218.** *Nomad Acquisition Corp. v. Damon Corp.,* 1988 WL 383667, at *1 (Del.Ch. Sept. 20, 1988).

**219.** *In re Fuqua Indus., Inc. S'holder Litig.,* 1997 WL 257460, at *10 (Del.Ch. May 13, 1997) (emphasis added).

**220.** *Schnell,* 285 A.2d at 439.

**221.** *Williams v. Geier,* 1994 WL 514871, at *3 (Del.Ch. Sept. 9, 1994).

**222.** *Condec Corp. v. Lunkenheimer Co.,* 230 A.2d 769, 776 (Del.Ch.1967).

**223.** Pl.'s Post-trial Reply Br. at 15 (citing Tr. at 1038 (Dornbush)).

**224.** Tr. at 1039.

**225.** Schwartz Dep. at 391.

**226.** *See In re Fuqua Indus., Inc.,* 1997 WL 257460, at *10.

na."[227] For fiscal year 2003, the law firm, where Dornbush's son also was a partner, received fees from Benihana of more than $1,000,000.[228] Dornbush is 75, however, and no longer a profit sharing partner in his law firm. Dornbush separately received $5,000 a month from Benihana for consulting services.[229] Dornbush testified at trial and I found him to be a credible witness. Having considered Dornbush's testimony and that of several other witnesses and having reviewed the relevant documentary evidence, I find that Dornbush did not facilitate the BFC Transaction primarily or solely for the purpose of protecting his tenure or that of any other director.

Although Schwartz had no significant source of income other than the compensation he received from Benihana,[230] he has an employment agreement with Benihana that prevents his termination as CEO, without cause, until 2009. Even after completion of the BFC Transaction, BOT is still the largest stockholder of Benihana. Moreover, although BFC generally invests for the long term and does not frequently change management, there is no evidence of any special relationship between BFC or Abdo on the one hand and Schwartz and Dornbush on the other. BFC presumably will expect good performance from Benihana and its managers. Hence, it is reasonable to infer that BFC would not hesitate to remove Schwartz from his positions if

grounds for a termination for cause existed.

BOT also cites various actions Schwartz took in 2003 and 2004 that it contends support a finding that Schwartz acted for an improper entrenchment purpose. For example, Plaintiff suggests that Schwartz acted improperly when he switched directorships with Sano. By making that change, Schwartz had the Class A, instead of the Common, stockholders vote for his election.[231] This action shows that Schwartz recognized the threat BOT potentially posed to his directorship. The switch, however, effectively reduced BOT's ability to remove Schwartz from office, thus reducing his motivation to approve the BFC Transaction solely or primarily for entrenchment purposes.

Plaintiff also asserts that Dornbush's law firm and Schwartz looked into the possibility of issuing a large number of Class A shares, just to dilute the BOT shares.[232] They further assert that Dornbush even admitted that had the shares been issued for that reason, it would have been for a non-legitimate purpose.[233]

In my opinion, Plaintiff exaggerates the importance of this incident. Schwartz explained that Benihana constantly considered the effect of a stock issuance that would combine the Common and Class A shares.[234] Before the BFC Transaction, the Common and Class A shares had un-

227. Tr. at 1041 (Dornbush).

228. Dornbush Dep. at 15–16; Tr. at 1042 (Dornbush).

229. Tr. at 1042 (Dornbush).

230. Tr. at 6 (Schwartz).

231. *See* Schwartz Dep. at 391.

232. Pl.'s Post-trial Reply Br. at 16–17.

233. *Id.* at 16 (citing Tr. at 1054–55 (Dornbush)).

234. Tr. at 28 (Schwartz). He testified that "[w]e constantly asked that question, was there any way that the company considering, is the company discussing the common—the combination of the two shares, collapsing the [common and class A] shares so that it would become one vote, one share, and there would be more liquidity." *Id.*

equal voting rights.[235] The Class A shareholders exclusively elect 25% of the directors and have 1/10 vote per share; the Common Stock vote on the remaining 75% of directors.[236] Schwartz testified that the Common shareholders and the Class A shareholders constantly encouraged Benihana to consider combining the two share classes because it would increase the Company's liquidity.[237] This was particularly important to Benihana because the constant complaint from Wall Street was that "there's no liquidity because of this situation." [238] Therefore, Benihana had legitimate reasons for considering a stock issuance that might have the effect of diluting the BOT shares.

On August 28, 2003, Schwartz sent a fax to Dornbush discussing the effect on voting rights if Benihana continued to issue a dividend of 10 or 15% per year.[239] Schwartz calculated that if Benihana issued a 10% dividend every year then by 2016 the amount of Common Stock outstanding would fall below the 12.5% threshold for triggering the Class A shares ability to participate with the Common Stock in the election of their 75% of the directors.[240]

Another hypothetical scenario Schwartz discussed with Dornbush around September 2003 was the feasibility of issuing over 16 million Class A shares and thereby causing the percentage of Common Stock to fall below 12.5% of the total.[241] Such a transaction would have diluted BOT's voting power to less than 30%. As previously mentioned, Dornbush indicated that such a transaction would not be feasible and would be for a nonlegitimate corporate business purpose.

I find that Schwartz's consideration of the latter scenario, even if only in passing, shows that he was concerned about BOT's control of Benihana in late 2003. Considering all the evidence, including the testimony of Schwartz and Dornbush, however, I find that Schwartz's concern did not infect his own or the Board's decisionmaking process in connection with the BFC Transaction. I likewise conclude that neither Dornbush nor a majority of the members of the Benihana Board had entrenchment or dilution of BOT as their sole or primary purpose in approving the BFC Transaction. Instead, I find that the directors who approved the BFC transaction did so on an informed basis, acting in good faith, and believing they were acting in the best interests of Benihana.

Plaintiff cites three cases in which the court found a motive to entrench because the Board could have addressed the asserted need by alternative nondilutive means and failed to give an adequate explanation as to why the directors chose a dilutive financing scheme. Defendants assert that each of these cases is distinguishable. I will address each in turn.

In *Canada Southern Oils v. Manabi Exploration Co.*, the board approved a dilutive issuance which caused the majority shareholder to lose control of the company.[242] The board claimed it needed to issue the shares to raise funds to solve

---

235. Tr. at 24.

236. *Id.*

237. Tr. at 29 (Schwartz).

238. *Id.*

239. JX 21.

240. *Id.* He also calculated that if Benihana issued a 15% dividend of Class A shares every year then by 2011 the outstanding Common stock would fall below the threshold. *Id.*

241. *See supra,* at 7–8.

242. 96 A.2d 810 (Del.Ch.1953).

their financial crisis. The court, however, did not believe the company had a major financial crisis and had doubts as to whether the directors could justify the dilutive issuance without giving plaintiff the opportunity to purchase the shares.[243]

Further, the court found persuasive several facts not present in this case. First, the directors never offered the controlling shareholder the option to purchase the shares, choosing instead to blindly assume they would not help.[244] In this case BOT had the opportunity to help fund the construction and Renovation Plan, but failed to make any proposal demonstrating that they had the necessary funds. Second, the notice for the directors' meeting made no reference to the possibility of selling shares of the company.[245] In contrast, the Benihana directors met several times to discuss their funding options and knew each time they would discuss the funding issue. The court in *Canada Southern Oils* held that:

> When the undisputed facts are viewed cumulatively I find it reasonabl[e] to infer that the primary purpose behind the sale of these shares was to deprive plaintiff of the majority voting control. Hagan and his associates did too much too soon with too little disclosure to justify a contrary conclusion.[246]

That is not the case here.[247] The Benihana Board had valid reasons to use equity as opposed to debt financing. Everyone, including Kevin Aoki, agreed that the Company needed to proceed with its Construction and Renovation Plan. Benihana carefully considered the BFC Transaction and had Morgan Joseph explore the option of debt financing. Morgan Joseph concluded that debt financing was not the best option because they feared it might reduce the flexibility Benihana needed to take advantage of attractive acquisition opportunities that might present themselves.[248] For example, the Wachovia financing offer contained a provision limiting the amount Benihana could borrow to 1.5 times EBITDA. This restriction, which spanned five years, could have substantially limited Benihana's ability to borrow funds.

Morgan Joseph also recommended that Benihana obtain equity financing first so that it could gain flexibility, and then use that financing as leverage to negotiate better terms on their existing line of credit with Wachovia.[249] In Joseph's words, "[T]he oldest rule in our business is you raise equity when you can, not when you need it."[250] Thus, unlike the situation in *Canada Southern Oils*, I find the Benihana Board had legitimate and substantial reasons for favoring the BFC Transaction over relying exclusively on debt financing.

Plaintiff relies on *Packer v. Yampol* for the proposition that "[a]n inequitable purpose can be inferred where the directors' conduct has the effect of being unnecessary under the circumstances, of thwarting shareholder opposition, and of perpetuating management in office."[251] The situa-

---

243. *Id.* at 813–14.

244. *Id.* at 813.

245. *Id.*

246. *Id.*

247. Among other differences, *Canada Southern Oils* dealt with a preliminary injunction, which involves a different standard than a post-trial situation like this case.

248. Tr. at 631–32 (Joseph).

249. Tr. at 630–31.

250. Tr. at 631.

251. 1986 WL 4748, at *16 (Del.Ch. Apr.18, 1986).

tion in *Packer v. Yampol*, however, was far more egregious than here. In *Packer* the board approved the issuance of stock in the midst of a proxy fight. The issuance included "supervoting" features, conferring upon the holders 44% of the corporation's total voting power. This allowed defendants to "virtually assur[e] the outcome of the election of directors." [252]

As previously stated, Benihana had a legitimate need for financing that reasonably could be satisfied through equity financing. Secondly, Benihana did not issue the stock in the midst of a proxy contest; rather the stock issuance was conceived, presented and negotiated months before any contest, or even the threat of a contest. Finally, unlike *Packer*, the stock issuance did not "virtually assur[e] the outcome of the election of directors." In fact, after the BFC Transaction, BOT won a proxy contest to remove one of the incumbent directors from his seat.[253]

*Condec Corp. v. Lunkenheimer Co.*[254] is equally distinguishable. There the transaction at issue was a share exchange that brought in no new capital to the Company and had no corporate purpose other than to reduce plaintiff's stock holdings.[255] The court also noted the "haste with which the basic ... transaction was hammered out." [256] Such extreme circumstances do not exist in this case.

Further, even if the Court were to have found, which I did not, that one or two of the Benihana directors acted for the sole or primary purpose of entrenchment, a majority comprised of other directors voted to approve the BFC Transaction and I have found that their assent to the transaction was not the result of fraud or manipulation by their fellow directors. An entrenchment effect alone, even assuming such an effect exists in this cause, is not enough to demonstrate a primary or sole purpose to entrench.

Therefore, Plaintiff has failed to meet their burden as to the claim of improper purpose. I find that the primary purpose of the BFC Transaction was to provide what the directors subjectively believed to be the best financing vehicle available for securing the necessary funds to pursue the agreed upon Construction and Renovation Plan for the Benihana restaurants.

### D. Director Defendants' Alleged Breaches of the Duty of Loyalty

■ BOT contends that Schwartz, Dornbush and Abdo, with the help of Morgan Joseph, manipulated the board process that led to the approval of the BFC Transaction, thereby breaching their fiduciary duties. Further, Plaintiff asserts that each of the directors breached their duty of loyalty by approving the BFC Transac-

**252.** *Id.* at *9.

**253.** The proxy contest occurred after BFC purchased the first tranche of Preferred Stock. In its brief, BOT argues that the margin by which it won was so small that it would have lost had the second tranche already occurred. Pl.'s Post-trial Reply Br. at 17 (citing JX 103; Atkins Dep. at 218–19). That argument relies on speculation, and BOT presented no other evidence that suggests that the BFC Transaction virtually assured the election of any directors. To the extent BOT's complaint is that it might no longer control the election of certain directors, there is no evidence that anything in the Certificate of Incorporation, the bylaws, or a separate contract gave BOT the right to control the Company or to be protected from dilution. *See Harrah's Entm't, Inc. v. JCC Holding Co.*, 802 A.2d 294, 314 (Del.Ch.2002) (customary for agreements concerning board control to be cemented by voting agreements).

**254.** 230 A.2d 769 (Del.Ch.1967).

**255.** *Id.*

**256.** *Id.*

tion in order to protect their own incumbency.[257]

The Delaware Supreme Court has described the duty of loyalty as follows:

> Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests.... A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there be no conflict between duty and self-interest.[258]

■ No safe-harbor exists for divided loyalties in Delaware.[259] The duty of loyalty, in essence, "mandates that the best interest of the corporation and its shareholders take precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."[260] "The classic example that implicates the duty of loyalty is when a fiduciary either appears on both sides of a transaction or receives a personal benefit not shared by all shareholders."[261]

In my opinion, Schwartz, Dornbush and Abdo, did not manipulate the Board to approve the BFC Transaction, either individually or in concert with one another or Morgan Joseph. As discussed above, the directors did not act out of a motivation to entrench themselves or any other self-interest or as a result of domination or control by an interested director. In addition, because the Board is staggered, it would have taken Keiko Aoki two or three years after Rocky Aoki's death to remove the directors from their positions, even if the BFC Transaction had not occurred.

Having already found that a majority of disinterested and independent directors approved the BFC Transaction and that the Transaction was not entered into for an improper purpose, I find no grounds to believe that the directors breached their fiduciary duty of loyalty. BOT has the burden of proving their contrary allegation by a preponderance of the evidence. They have not met their burden. Therefore, I conclude that none of the Director Defendants breached their fiduciary duty of loyalty.

## E. Director Defendants' alleged breaches of the duty of care

■ Plaintiff contends that the directors violated their fiduciary duty of care by failing to inform themselves of basic information about the BFC Transaction.[262] Defendants argue that even if the directors failed properly to inform themselves, their conduct in this case does not

---

257. Pl.'s Opening Post-trial Br. at 41.

258. *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939); *In re Walt Disney Co.*, 2005 WL 2056651, at *33–34.

259. *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del.1983).

260. *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del.1993).

261. *In re Walt Disney Co.*, 2005 WL 2056651, at *33–34 (internal quotations omitted).

262. Pl.'s Opening Post-trial Br. at 41.

rise to the level of gross negligence, and therefore cannot constitute a violation of the duty of care.[263]

 The duty of care includes a duty that directors inform themselves, before making a business decision, of all material information reasonably available to them.[264] The duty also includes a requirement that directors reasonably inform themselves of alternatives.[265]

 Director liability for breaching the duty of care "is predicated upon concepts of gross negligence."[266] In the duty of care context gross negligence has been defined as "reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason."[267] Because duty of care violations are actionable only if the directors acted with gross negligence, and because in most instances money damages are unavailable to a plaintiff who theoretically could prove a duty of care violation, such violations are rarely found.[268]

The challenged directors' conduct in this case does not rise to the level of gross negligence. First, the directors were encouraged to take the February board books home and study them. These books outlined alternative methods of financing the BFC Transaction.[269] Second, Morgan Joseph specifically discussed the change in net debt figures at the May 6 meeting and distributed the final term sheet with BFC to the directors.[270] The Board also ob-

tained a fairness opinion from Morgan Joseph.

Further, the Board met several times after the May 6 meeting to discuss the BFC Transaction. The Board met on May 20 and June 11, and voted to proceed with the transaction after considering BOT's objections and the purported alternatives suggested by BOT's counsel. Additionally, the disinterested and independent directors who voted in favor of the transaction constituted a majority of the Board. These facts demonstrate that the Board took adequate steps to review the BFC Transaction. Therefore, the directors did not breach their fiduciary duty of care.

### F. Summary of the Court's Application of the Business Judgment Rule

 In *In re RJR Nabisco, Inc. Shareholders Litigation,* the Court stated:

The business judgment form of review encompasses three elements: [1] a threshold review of the objective financial interests of the board whose decision is under attack (i.e., independence), [2] a review of the board's subjective motivation (i.e., good faith), and [3] an objective review of the process by which it reached the decision under review (i.e., due care).[271]

In this case, I have followed those steps and I have first concluded that a majority of the disinterested and independent directors approved the BFC Transaction.

263. Defs.' Post-trial Ans. Br. at 34–35.

264. *Aronson,* 473 A.2d at 812.

265. *UIS, Inc. v. Walbro Corp.,* 1987 WL 18108, at *2 (Del.Ch. Oct. 6, 1987).

266. *Aronson,* 473 A.2d at 812.

267. *Tomczak v. Morton Thiokol, Inc.,* 1990 WL 42607, at *12 (Del.Ch. Apr. 5, 1990) (internal quotations omitted).

268. *In re Walt Disney,* 2005 WL 2056651, at *33.

269. Tr. at 633–40 (Joseph).

270. Tr. at 657.

271. 1989 WL 7036, at *13 (Del.Ch. Jan. 31, 1989).

Then, I found that the directors acted with a good faith belief that equity financing represented the best method to finance Benihana's Construction and Renovation Plan and that the directors believed equity financing best served the interests of the Company. Finally, after reviewing the process through which the directors approved the Transaction I have found that the directors reached their decision with due care. Consequently, the Board validly exercised their business judgment in approving the BFC Transaction. This Court will not disturb that decision.

## III. CONCLUSION

For the reasons stated in this Opinion, the Court concludes that the Benihana Board validly approved the BFC Transaction and denies all BOT's claims for relief, whether asserted individually or derivatively. In particular, the Court holds that the BFC Transaction was not void *ab initio* as *ultra vires* and that the Director Defendants did not breach any fiduciary duty to Benihana or its stockholders in connection with the BFC Transaction. Because Plaintiff has failed to establish liability on the part of any of the Director Defendants, I also dismiss Plaintiff's claims against BFC for aiding and abetting those Defendants.

Defendants counsel shall prepare a proposed form of judgment and submit it, on notice, within 10 days.

**IT IS SO ORDERED.**